LOCRICCHIO v EVENING NEWS ASSOCIATION

Docket No. 86351. Argued October 3, 1990 (Calendar No. 10). Decided
    August 26, 1991. Rehearing denied 439 Mich 1202.

    Joseph J. Locricchio and Gary Francell, owners and developers of
        Pine Knob entertainment complex, brought an action for libel
        in the Wayne Circuit Court against The Evening News Associa-
        tion and certain of its reporters, alleging that the entire tenor
        of a series of articles on Pine Knob that appeared in the
        Detroit News in 1979 falsely implied that they were members
        or associates of organized crime. The court, Susan D. Borman,
        J., denied the defendants' motions for summary judgment. The
        Court of Appeals, BRENNAN, P.J., and WAHLS and M. DODGE,
        JJ., affirmed in an unpublished opinion per curiam, holding
        that in order to test its libelous quality, a publication is to be
        considered as a whole and that the allegation of defamation by
        implication gave rise to a genuine issue of material fact (Docket
        No. 64729). The Michigan Supreme Court denied leave to
        appeal, 419 Mich 860 (1984). The United States Supreme Court
        denied certiorari, 469 US 1018 (1984). Following trial, the jury
        returned a verdict in favor of Francell only, finding with regard
        to Locricchio that there had been no publication of false or
        defamatory facts to a third party. The court directed a verdict
        for the defendants however, on the ground that the evidence
        regarding falsity did not support the jury's verdict. The Court
        of Appeals, GILLIS, P.J., and DOCTOROFF and K. N. SANBORN,
        JJ., reversed and reinstated the jury award in an unpublished
        opinion per curiam, citing its previous opinion and applying the
        law of the case doctrine (Docket No. 98002). The defendants
        appeal.

        In an opinion by Justice BRICKLEY, joined by Justices BOYLE,
        RILEY, and GRIFFIN, the Supreme Court held:

        The Court of Appeals erred in relying on the law of the case

REFERENCES

Am Jur 2d, Appeal and Error §§ 746, 750; Constitutional Law
    §§ 505, 510; Libel and Slander §§ 442, 444.

Constitutional aspects of libel and slander—Supreme Court cases.
    28 L Ed 2d 885.

Erroneous decision as the law of the case on subsequent appellate
    review. 87 ALR2d 271.

doctrine to reverse the trial court's directed verdict instead of independently reviewing the record. Because of the lack of proven falsity in either the underlying facts or in their implication, the plaintiffs failed to carry their burden of proving either false and defamatory factual statements or false implication.

1. The law of the case doctrine generally provides that once an appellate court has passed on legal questions, those questions will not be differently determined on subsequent appeal of the same case involving the same material facts. In libel cases affecting constitutionally protected public discourse, the law of the case doctrine should not preclude a second review by a subsequent panel of the Court of Appeals, but must yield to a competing doctrine: the requirement of independent appellate review of facts relating to the constitutional issues. In such cases, appellate courts must conduct an independent review of the record to ensure that no forbidden intrusion upon free expression involving actual malice has occurred and by examining for themselves the statements in issue and the circumstances under which they were made to see whether they are of a character protected by the First Amendment. An independent appellate review of the burden of proof with regard to falsity in private-figure, public-interest cases deters forbidden intrusion on the field of free expression as a logical corollary to independent review of actual malice. In this case, the application by the Court of Appeals of the law of the case doctrine failed to accord the necessary protection.

2. Defamation by implication in private-figure, public-interest media cases requires proof both of defamatory meaning and of falsity, a burden not carried by the plaintiffs. The law of libel may not impose damages for injuries to reputation arising from a press report of materially true facts about a public figure on a matter of public interest. To test the libelous quality of a newspaper article, the publication must be considered as a whole, including the character and display of its headlines. While a private-figure plaintiff deserves more protection of reputation than a public-figure plaintiff, truth may not be the subject of civil or criminal sanctions where discussion of public affairs is concerned. The First Amendment protects some degree of falsity in order to protect speech that matters.

3. In cases challenging reports by the media on matters of public interest, a private-figure plaintiff bears the burden of proving falsity. Defamation by implication is not so analytically distinct from defamation by explicitly false facts to require departure from general and First Amendment libel law. A litigant alleging defamation by implication still must demon-

strate a statement or implication capable of defamatory meaning and prove falsity and fault by a preponderance of the evidence. In this case, a review of the record indicates that the plaintiffs failed to carry their burden of proving the falsity either of the statements or the implications at issue.

Chief Justice Cavanagh, concurring in the result, stated that as a matter of law, a defendant in an action for defamation cannot be held liable for possible inferences, speculations, or conclusions of readers, where the defendant has not made or directly implied any provably false factual assertion or, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication. The overall implications that may flow from true factual statements, straightforwardly presented, are ordinarily as privileged for defamation purposes as the statements themselves.

The underlying factual issue of falsity is not subject to independent review as a question of constitutional fact. Although the First Amendment requires a plaintiff in an action for defamation to bear the burden at trial of proving falsity, at least where the case involves speech of public concern, it does not follow that an appellate court must or should independently review the merits of the issue and thereby substitute its judgment de novo for that of the jury.

In this case, there is no claim that by omitting crucial relevant facts the defendants conveyed any skewed or misleading implications. The implications of which the plaintiffs complain simply are those that, whether taken separately or together, ordinarily and naturally might be expected to flow from the specific factual statements published. While many of those statements undoubtedly were defamatory in that they had a tendency to injure the reputations of plaintiffs, concededly they also were true. And while the overall implications allegedly conveyed by the articles as a whole also may have been defamatory, their thrust was not misleading or different in kind from that of the concededly true specific statements. Rather, the implications, if any, simply reflected the accumulated thrust of the concededly true stated facts. It logically follows that the implications, even if not themselves capable of being verified or disproven, necessarily would be protected by the same defense of truth that shields the specific factual statements. True facts, whatever their implications, cannot become actionable simply because they are collected and published together in a straightforward manner.

Reversed.

Justice Levin, dissenting, stated that there was sufficient

evidence for submission to the jury that the Detroit News falsely implied that the plaintiffs were members or associates of organized crime. This is not a case where a plaintiff seeks to hold a media defendant liable for possible inferences, speculations, and conclusions drawn by readers from a straightforward presentation of the facts. Rather, the headlines and tag lines and persistently posed questions whether organized crime was involved suggested the inferences, speculations, and conclusions for the readers. The jury properly could find that a reasonable reader could understand that the series of articles conveyed that the plaintiffs were guilty of a continuing course of criminal wrongdoing generally associated with organized crime and that that communication was defamatory and false.

Justice MALLETT took no part in the decision of this case.

1. LIBEL AND SLANDER — APPELLATE REVIEW — FIRST AMENDMENT — LAW OF THE CASE.

The law of the case doctrine notwithstanding, appellate courts may depart from a prior holding where convinced that the holding is clearly erroneous and would work a manifest injustice; in a case of libel, an appellate court must independently conduct a review of the record to ensure that no forbidden intrusion of free expression has occurred (US Const, Am I).

2. LIBEL AND SLANDER — DEFAMATION BY IMPLICATION — PRIVATE-FIGURE PLAINTIFFS — PUBLIC-INTEREST MEDIA DEFENDANTS — BURDEN OF PROOF.

In cases challenging reports by the media on matters of public interest, a private-figure plaintiff alleging defamation by implication bears the burden of demonstrating that the statement or implication at issue is susceptible of defamatory meaning and of proving falsity and fault to the same extent necessary to establish liability for defamation by statements of fact, i.e., by a preponderance of the evidence.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Jeremiah J. Kenney* and *Pamela Hobbs*), for the plaintiffs.

*Butzel, Long, Gust, Klein & Van Zile* (by *Richard E. Rassel, James E. Stewart, Gordon J. Walker,* and *Leonard M. Niehoff*) for the defendants.

Amici Curiae:

*Honigman, Miller, Schwartz & Cohn* (by *Herschel P. Fink* and *Michael A. Gruskin*) for Detroit Free Press, Inc., and Scripps Howard Broadcasting.

*Dawn L. Phillips* for Michigan Press Association.

*Kasiborski, Ronayne & Flaska, P.C.* (by *John J. Ronayne, III*), for Michigan Association of Broadcasters and Post-Newsweek Stations, Michigan, Inc.

*Neal Bush, Monica Farris Linkner,* and *Charles P. Burbach* for Michigan Trial Lawyers Association.

BRICKLEY, J. Two competing legal regimes collide in libel cases implicating First Amendment concerns. Libel law enforces society's "pervasive and strong interest in preventing and redressing attacks upon reputation" caused by false and defamatory statements,[1] while constitutional law safeguards the free flow of ideas and opinions on matters of public interest that lie at "the heart of the First Amendment's protection."[2] The inherent analytical tension between these regimes requires a court both to protect reputational interests, and to accord "breathing space" to principles of freedom of press and speech. It remains a precarious task to balance these interests in cases, such as this one, that pit private-figure plaintiffs against a report by a media defendant on a matter of public

---

[1] *Rosenblatt v Baer*, 383 US 75, 86; 86 S Ct 669; 15 L Ed 2d 597 (1966). Justice Stewart's concurring opinion underscored that libel law's protection of reputation from defamatory falsehoods "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Id.* at 92.

[2] *First Nat'l Bank of Boston v Bellotti*, 435 US 765, 776; 98 S Ct 1407; 55 L Ed 2d 707 (1978).

interest.[3] This case tosses into the balance the tortuous issue of libel by implication, in contrast to specific allegations of defamatory false statements of fact.

For our purposes, the controversy began in 1979,[4] when the Detroit News published a four-part series of articles entitled "The Pine Knob story." In response, the owners and developers of Pine Knob, plaintiffs Joseph Locricchio and Gary Francell, sued the Evening News Association (hereinafter the Detroit News) and its reporters for libel in 1980.[5] The plaintiffs alleged that the entire tenor of the Pine Knob series falsely implied that plaintiffs were members or associates of organized crime, but did not identify any specific false statements in the articles.

The Detroit News attacked the plaintiffs' failure to identify any specifically false factual statements, and moved for summary judgment. Both the trial court and the Court of Appeals denied the summary judgment motion. The case went to trial.

A jury trial of prodigious length ultimately produced a three million dollar verdict for plaintiff Francell.[6] However, the trial court ruled that the evidence regarding falsity did not support the

[3] This opinion elucidates in later sections that "[a] traditionally . . . strong affinity [exists] between first amendment jurisprudence and [public discourse]." Post, *The constitutional concept of public discourse: Outrageous opinion, democratic deliberation, and Hustler Magazine v Falwell*, 103 Harv L R 603, 626 (1990).

[4] The plaintiffs' original action also included allegations of defamation arising from articles published by Detroit News columnist Pete Waldmeir in 1972 and 1977, and an editorial published by Detroit News editor Bill Giles in 1979. Only the Pine Knob series of articles remains at issue on appeal.

[5] The plaintiffs also sued for invasion of privacy, intentional infliction of emotional distress, and contractual interference. These counts have been dismissed, and only the libel allegations remain in dispute.

[6] The jury inexplicably found no publication of facts to a third party with regard to plaintiff Locricchio and accordingly awarded him zero damages.

jury's verdict, and directed a verdict for the Detroit News. The plaintiffs appealed the posttrial directed verdict, and prevailed. The Court of Appeals, citing its previous opinion on summary judgment, applied the law of the case doctrine to reverse the trial court, and reinstated the jury award.

This appeal can be said to involve essentially two issues. First, did the Court of Appeals err in reversing the trial court's directed verdict and reinstating the jury verdict in favor of the plaintiffs? Second, can a private-figure plaintiff recover damages in a media-defendant/public-interest subject matter libel action where the plaintiff alleges defamatory implication but fails to identify or prove any materially false factual statements or implications or omissions?[7]

We answer the first question affirmatively, and hold at the outset that the Court of Appeals erred in relying on the law of the case doctrine to reverse the trial court's directed verdict, instead of independently reviewing the record in a libel case of First Amendment import. We find it unnecessary under the facts presented to answer the second question as posed because of a lack of proven falsity in either the underlying facts or in their implication, and hold simply that the plain-

---

[7] The parties do not dispute the configuration in this case of private-plaintiff/public-interest/media-defendant. This opinion generally refers to the media/nonmedia status of parties in the descriptive rather than a normative sense. Dicta suggests that a majority of the Supreme Court believes that "in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities." *Dun & Bradstreet, Inc v Greenmoss Builders, Inc,* 472 US 749, 784; 105 S Ct 2939; 86 L Ed 2d 593 (1985) (Brennan, J., dissenting). See note, *The burden of proving truth or falsity in defamation: Setting a standard for cases involving nonmedia defendants,* 62 NYU L R 812, 840 (1987) (noting that the "Supreme Court has yet to decide whether [the media-nonmedia] distinction is necessary or even viable").

tiffs failed to carry their burden of proving either false and defamatory factual statements or false implications. Accordingly, the Court of Appeals erred in reinstating the jury verdict in favor of plaintiffs.

## I. FACTUAL BACKGROUND

The facts presented show that editorial superiors at the Detroit News asked veteran reporters Michael Wendland and Jean Gadomski to investigate rumors of organized crime involvement in the plaintiffs' Pine Knob entertainment complex in 1978. Reporters Wendland and Gadomski conducted an intensive two-month investigation of the Pine Knob facility in 1979. Their investigation reached its apex with an audiotaped interview conducted with the plaintiffs (in the presence of their attorney) in April of 1979.

The interview with the plaintiffs, and the independent research of the Wendland-Gadomski team, sowed the seeds for the four-part "Pine Knob story" series of articles that ran in the Detroit News from April 22 to 25, 1979. The centrality of the Pine Knob series to this lawsuit leads us to detail the content of the four articles below.

### A. THE FIRST ARTICLE: "THE PINE KNOB STORY: HOW 2 FRIENDS AND HUSTLE CREATED A BIG RESORT, MILLIONS IN DEBTS AND A QUESTION: 'IS IT MAFIA?'"

The first article appeared under the rather sensational headline above. Its opening paragraph described the plaintiffs as "land gamblers . . . [p]ower brokers with the right connections—widely suspected to be 'Mafia.'" The article quoted plaintiff Locricchio as conceding "the feeling 'Pine Knob is Mafia' is so widespread that 'even my

mother sometimes has her doubts.'" The article
noted that although the plaintiffs "vehemently
deny mob involvement, they admit that they are
on 'all the computer lists' as organized crime
figures."

The first article further noted that plaintiffs
agreed to talk to the Detroit News, in their words,
"'to clear the air.'" It provided provocative details
of the plaintiffs' backgrounds, informing readers,
for example, that the plaintiffs "wear silk shirts,
drive expensive [cars] and fly about the country in
their own twin-engine airplane."

The report asserted that "[Locricchio] is proud of
his Sicilian heritage and protective of his large
family. He is outgoing and talkative." It described
Francell in contrast as "quiet, almost shy," and
noted that "Francell is of French and German
heritage." The report stated that although the
plaintiffs felt "[a]ngered by what they claim is
harassment from the FBI, the Internal Revenue
Service and state and local law enforcers, they
nevertheless say they can see why 'people think
we're mob.'"

The report then detailed four key incidents,
which essentially comprise the gravamen of plain-
tiffs' defamation by implication claims, in what the
authors described as "the confusing, often incredi-
ble story" of how the plaintiffs created Pine Knob.
The article summarized these four incidents as
consisting of:

1) Two unsolved murders with links to peo-
ple who figured in Pine Knob's development.

2) A so-called money wash designed to hide
the source of a $200,000 loan to Pine Knob.

3) "A $4 million cost overrun" by the plain-
tiffs in the building of a Las Vegas Hotel
theatre.

4) "Several investors associated with orga-
nized crime who either lent or helped [the
plaintiffs] raise large sums of money."

The article sketched the history of Pine Knob
from the original ownership in the 1950s to the
plaintiffs' acquisition in 1971, asserting that "[t]he
stories of mob involvement in Pine Knob began
with [the acquisition of Pine Knob by reputed
organized crime-associated investors in 1962]." The
plaintiffs purchased Pine Knob from these inves-
tors in 1971.

The authors reported that the plaintiffs con-
fronted financial troubles virtually from the mo-
ment they acquired Pine Knob: troubles so severe
that by 1972 the partners "needed a tremendous
cash flow [but] didn't have it." The report asserted
that the plaintiffs' financial condition had so dra-
matically deteriorated that

> [by] the summer of 1972, [the plaintiffs] were in
> the worst financial bind of their careers. They
> needed $200,000—"desperately," says Locricchio—
> to stave off foreclosure on outstanding notes. The
> partners would get the money. But in doing so,
> they would become involved in an incredible finan-
> cial intrigue to be investigated by three federal
> grand juries. More than anything else, it was that
> loan that put Locricchio and Francell on the orga-
> nized crime lists.

The first article ended with a trailer in bold letters
that proclaimed: "Tomorrow: A money wash and
two murders."

B. THE SECOND ARTICLE: "THE PINE KNOB STORY:
HOW [A] LOAN GOT 'WASHED.' "

As promised, the second article appeared under

the above headline on Monday, April 23, 1979. It focused mainly on two incidents: the unsolved 1972 and 1974 murders of Agnes Brush and Harvey Leach, and a $200,000 loan the plaintiffs obtained to finance the Pine Knob complex in 1972.

Page one of the article displayed a photograph of an automobile with its trunk open. The caption under this photograph announced, "Harvey Leach's car was found with his body in the trunk." The authors pointed out that "Locricchio and Francell say they know nothing about either [the Leach or Brush] killing . . . . A score of police agencies have investigated the murders and have not proved otherwise."

The second article also asserted that "[the plaintiffs] agree that their business connections, when diagrammed on a blackboard, make them appear to be 'organized crime figures,' " and paraphrased Locricchio as asserting "that such a diagram, drawn by police agencies, as well as his Sicilian heritage, has unfairly put the sign of the Mafia on Pine Knob."

It recounted that an unknown assailant had stabbed bookkeeper Agnes Brush to death three months after her employer, William Magill, loaned $200,000 to the plaintiffs for Pine Knob financing. The article described the late Harvey Leach as a "Southfield furniture magnate," who "had been working with [the plaintiffs] on construction plans for a chain of furniture stores, called Joshua Doore. Loans negotiated through the same Toronto money broker [that engineered the so-called money wash of the Magill loan] financed the building of those stores."

The article quoted Locricchio's version of how the controversial $200,000 Magill loan originated as follows:

"I called [Pine Knob business associate Adele Volpe] and said I needed $200,000 for a month, two months . . . . [Volpe] said he couldn't help but he'd see what he could do. [Volpe] called me back. He said, 'I have this friend. His name is Bill Magill. He'll give you the money.' "

However, because Magill feared that disclosure of his finances might endanger the safety of his daughter, he insisted as a condition that the plaintiffs conceal the source of the loan.

Citing an FBI interview with Magill in 1973, the authors noted that although Magill had never met the plaintiffs, he "withdrew all but $5,000 of his life savings to loan [the plaintiffs] $200,000." It also quoted an investigating FBI agent who asked, " 'Why on earth would two sensible people take all of their savings and give it to a relative stranger without any security . . .?' " The article asserted that the plaintiffs failed to repay the Magill loan until 1977, and then only "after Magill began a foreclosure procedure against Pine Knob."

The article then described the intricate method the plaintiffs employed to keep secret the source of the Magill loan with the help of "an old friend, Southfield attorney Fred Gordon." The authors noted that Gordon had "[o]nce before . . . helped Locricchio find a private money source" by putting Locricchio in touch with reputed organized crime figure Leonard Schultz in the late 1960s. The article quoted Locricchio as explaining that " 'Freddy [Gordon] had a brainstorm . . . . He said, "Look, instead of borrowing the money (directly from Magill), we'll use the money for collateral for another loan." ' " The article described the logistics of the Magill "money wash" as follows:

On July 25, 1972, [the plaintiffs] picked up the $200,000 from Magill. The next day, Francell

drove to Toronto with the money. Gordon flew there. Together, they entered the offices of Toronto attorney Joseph Burnett, who ran a large, international real estate financing company. Francell gave Burnett the cash. In turn, Burnett gave the Pine Knob partners a $200,000 loan, the check drawn on one of Burnett's companies, thus hiding Magill's role in the transaction. *While the transaction was legal, it was unorthodox* . . . . [Emphasis added.]

The final part of the article discussed the links between "people involved in laundering the $200,000 Magill loan" and the murders of Agnes Brush and Harvey Leach. It noted that "Locricchio and Francell . . . are puzzled by the coincidences. But they say they are only coincidences."

### C. THE THIRD ARTICLE: "THE PINE KNOB STORY: A BRUSH WITH BANKRUPTCY."

The third article in the series appeared under the above headline. It focused on the financial problems the plaintiffs experienced in 1975, partly as a result of FBI harassment, and detailed that the plaintiffs had obtained loans from a number of reputed organized crime figures. The article asserted that "[t]he partners even were overdue in paying their accountants" and quoted Locricchio as lamenting, " 'We couldn't get any financing through banks. We were up to here.' " It continued by stating that "[t]he financial difficulties were but part of their troubles, say Locricchio and Francell. At this time the FBI showed up to tell them they were going to be indicted [regarding the $200,000 Magill loan]."

The article pointed out that a federal grand jury ultimately indicted the plaintiffs for "lying about the Magill loan on a mortgage application from a

federally insured bank" in 1977. The plaintiffs
pleaded guilty and were fined $500. The article
stated that "[i]t is the only time either man has
been convicted of a crime."

The article also described how Locricchio had
secured a bid from reputed organized crime figures
James Tamer and Charles Goldfarb to construct a
"Pine Knob-like" music theatre at the Aladdin
Hotel in Las Vegas. The article stated that "Lo-
cricchio estimated construction costs [of the music
theater] at $6 million . . . [i]t ended up costing
$10 million." It quoted an affidavit from the 1978
indictment of Goldfarb and Tamer on charges to
illegally control the Aladdin's gambling casino "as
claiming that Locricchio was secretly offered a
'piece' of the Aladdin in exchange for his [con-
struction] work on the music theater." It also
referred to unnamed sources who claimed that
"the FBI questioned whether the $4 million cost
overrun was [ ] possibly an illegal 'bonus' to Locric-
chio," and described how the FBI tried to get
Locricchio to serve as a "snitch" against suspected
organized crime involvement in the Aladdin ho-
tel's gambling casino, an offer which he refused.

### D. THE FOURTH ARTICLE: "THE PINE KNOB STORY: PARTNERS STALKED BY MAFIA-HUNTERS."

The final article in the series appeared under
the above headline. Despite the headline, this
article really had little to do with stalking by
"Mafia-hunters." The article actually began on an
upbeat note, asserting that "[t]he owners of Pine
Knob entertainment complex . . . are bouncing
back from near bankruptcy and a public impres-
sion they are 'Mafia.'" It quoted Locricchio as
boasting, "'We ain't the Rock of Gibraltar yet [but
the Pine Knob facilities] are so strong that in spite

of all (the problems), we're going to overcome. There's no doubt now.' "

The article went on to note that the Pine Knob complex "turned a $700,000 profit in 1977-78." It quoted Locricchio as chalking up the FBI attention to "his Sicilian heritage and his business success." Locricchio conceded close acquaintances with numerous "alleged Mafia members," but contended that the government harassment because of these acquaintances amounted to guilt by association. The rest of the article described the relationship between the partners. It ended by noting that the "partners worry that the intensive law enforcement investigations into their activities over the last eight years will continue to haunt them."

## II. PROCEDURAL HISTORY

Four important events, outlined as follows, chart the procedural history of this case: the pretrial denial of summary judgment, the trial on the merits, the trial court's directed verdict, and the Court of Appeals reversal of the directed verdict.

### A. THE TRIAL COURT AND COURT OF APPEALS DENIALS OF SUMMARY JUDGMENT.

The plaintiffs' original and subsequent amended complaints alleged "[t]hat by the entire tenor of these publications, Defendants acted in reckless disregard of the falsity of their publications and said . . . that Plaintiffs Locricchio and Francell were persons engaged in organized crime and engaged in a continuing course of criminal misconduct or conduct of an immoral or reprehensible nature in both their personal and business relationships."

The plaintiffs' complaints did not identify a

single false statement that appeared in the Pine Knob articles. The defendants moved for summary judgment before trial. They contended that the absence of allegations of specific false statements in the complaint negated any issue of material fact. The trial court denied the motion.

Rebuked by the denial of summary judgment, the defendants countered with a number of interrogatories that asked the defendants to identify each alleged false statement in the Pine Knob series. The plaintiffs responded tersely:

> [T]he defamation allegations contained [in the complaint] are not necessarily based on a false statement(s) in any one particular article, but rather, . . . the entire series of articles . . . injured the reputations of plaintiffs as the same represented a false portrayal, implication, imputation and/or insinuation . . . .

Unsatisfied with this response, the defendants once again moved for summary judgment on the plaintiffs' libel claims, rearguing that no genuine issue of material fact existed because of the failure of the plaintiffs to allege any specific false statements of fact. Once again, the trial court disagreed, and denied defendant's summary judgment motion.

The Court of Appeals granted leave on interlocutory appeal to resolve the issue and issued its opinion in August 1983.[8] The Court of Appeals rejected the argument that the absence of specific allegations of false statements of fact mandated dismissal on summary judgment. The Court of Appeals relied on three cases to reach this conclusion: *Sanders v Evening News Ass'n,* 313 Mich

[8] This Court subsequently denied interlocutory appeal, and the United States Supreme Court denied certiorari.

334, 340; 21 NW2d 152 (1946), *Caldwell v Crowell-Collier Publishing Co,* 161 F2d 333, 335-336 (CA 5, 1947), cert den 332 US 766 (1947), and *Memphis Publishing Co v Nichols,* 569 SW2d 412, 419-420 (Tenn, 1978).

From *Sanders,* the Court of Appeals extracted the maxim that " '[t]o test its libelous quality, a publication is to be considered as a whole, including the character of the display of its headlines when the article is published in a newspaper, and the language employed therein.' " *Id.* at 340. From *Caldwell* and *Nichols,* the Court of Appeals extrapolated the proposition that "[i]nsinuation, imputation or inference may be as defamatory as a direct, unveiled assertion." Having thus affirmed the theoretical validity of a cause of action for defamation by implication, the Court of Appeals held that "[t]he pleadings have given rise to a genuine issue of material fact which is to be left to the trier of facts and cannot be disposed of by summary judgment," and remanded the case for trial.

### B. THE TRIAL.

The case proceeded to a sometimes vitriolic trial. One of the most controversial trial issues involved the authenticity and veracity of the tapes and transcripts from the Detroit News' interview of the plaintiffs in 1979.[9] The plaintiffs controverted many of the quotes from the taped interview that appeared in the Pine Knob series. The tape apparently had very poor sound quality and much contention reigned during the trial over what the plaintiffs had actually said or not said on the tape.

Reporter Michael Wendland, the lead author of

[9] The reporters had agreed to provide the plaintiffs and their attorney a duplicate copy of the taped interview. At trial, the plaintiffs contended that Detroit News had actually provided a blank copy.

the Pine Knob series, provided crucial testimony at trial. At the time of the trial, the law required a private plaintiff suing a media defendant on a report of public interest to prove actual malice.[10] Accordingly, much of Wendland's cross-examination targeted his state of mind regarding the truth of his factual reporting. Specifically, the plaintiffs' attorneys attempted to show that Wendland did not personally believe either that Locricchio and Francell were actually organized crime members or that Pine Knob was Mafia-owned.

On cross-examination Wendland testified, "I don't think there's organized crime involvement in the ownership of Pine Knob. I think organized crime has been involved in . . . helping your clients finance Pine Knob, and I also testified I don't think that your clients are organized crime members."

Wendland also testified that he did not use the term "money wash" regarding the $200,000 Magill loan to impute illegality, but rather to convey that "[the loan] was obscuring the source of the funds . . . what this loan did . . . was to hide the source of the money. And that certainly is unusual. That's a money wash."

The plaintiffs' trial attorney also tried assiduously to show that the Pine Knob series contained factual inaccuracies or omissions. He ultimately secured two admissions from Wendland regarding factual inaccuracies. First, Wendland conceded that the second Pine Knob article erroneously stated that a "score of police agencies" had investigated the plaintiffs regarding the Leach and Brush murders. Wendland could in fact name only fourteen, not twenty agencies, that had investigated

---

[10] Our decision in *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157; 398 NW2d 245 (1986), subsequently rejected the actual malice standard of liability in private-figure/public-interest cases.

the Leach/Brush murders, including three federal
grand juries and the Internal Revenue Service.
Wendland explained, "We use [the phrase 'a
score'] I think, a lot, you know, meaning a great
many, certainly more than a few."

Second, Wendland conceded inaccuracy regard-
ing the picture of Harvey Leach's car under the
caption, "Harvey Leach's car was found with his
body in the trunk," that appeared in the second
article. Wendland testified the caption "should
have said—I mean, that makes it sound like it
happened today, and my gripe was that it should
have said in 1974."

Wendland stood by the factual accuracy of the
rest of the series. He conceded that the question
printed throughout the articles, "Is it Mafia?"
arguably referred to the plaintiffs, whose names
were synonymous with Pine Knob. However, when
asked if the articles ever stated an answer to the
question "Is it Mafia?" Wendland replied:

> I think all four articles answer that question
> . . . if you read . . . your clients' response to this
> constant attention, constant rumors, you'll see
> them saying, "No, we are not Mafia." . . . [M]y job
> is to report the facts, put all the facts out there for
> people to make up their mind. And that's what we
> did in this story. [The plaintiffs] over and over
> again, point it out how these rumors have per-
> vaded over their whole lives and how these rumors
> are not true.

Pressed by his cross-examiner about the accu-
racy of the statement attributed to Locricchio in
the Pine Knob series " 'that [a hypothetical orga-
nized crime diagram] drawn by police agencies, as
well as his Sicilian heritage, has unfairly put the
sign of the Mafia on Pine Knob,' " Wendland
replied that the statement comprised not a direct

quote, but rather an accurate "paraphrase of the entire discussion" with the plaintiffs.

The plaintiffs' attorney tried also to show falsity in the first Pine Knob article's assertion that " '[s]everal investors associated with organized crime . . . either lent or helped Locricchio and Francell raise large sums of money' . . . ." Wendland refused to concede this statement contained material falsity, explaining that

> at the very start . . . when [the plaintiffs] first bought Pine Knob, one of the parties who owned it was a guy named Arthur Rooks. I think another owner was Alex Kachinko. Both of those people were associated with organized crime, and [the plaintiffs] bought Pine Knob from those people.
>
> \* \* \*
>
> [Pine Knob] was sold, I think, for a little over a million dollars on a land contract. In effect, Mr. Rooks, [Mr.] Kachinko . . . became the bankers. They held the land contract. I'm interpreting that to mean, in effect, they lent [plaintiffs] the money. . . . As the holder of the land contract, they had a very strong interest in Pine Knob . . . [the term "lent"] fit into that more than anything else. That's probably not entirely accurate, but it was—in effect, they ended up being owed money, lending money, they had an interest in it.

The plaintiffs' expert, one Professor Robert Bjork, a doctor of cognitive psychology at U.C.L.A., also provided crucial testimony at trial. The plaintiffs' attorney asked Dr. Bjork whether "the typical readers [of the Pine Knob series would] associate my clients, Mr. Locricchio and Mr. Francell, with [the murders of Agnes Brush and Harvey Leach]?" Bjork replied:

> I believe they would end up thinking that some-

how those murders are related somehow to the
financial goings-on. I don't believe they would
[necessarily] conclude [that] Mr. Locricchio and
Mr. Francell were involved personally in some
way.

The plaintiffs' attorney also asked Professor
Bjork's opinion regarding "whether or not the four
[Pine Knob] articles . . . when read by a typical
reader, created an impression that Mr. Locricchio
and Mr. Francell are associated with organized
crime?" Bjork replied, "In my opinion . . . the
typical reader would end up thinking that Mr.
Locricchio and Mr. Francell *have some kind of
connection* with organized crime." (Emphasis
added.)

For their part, the defendants essentially
mounted a defense of truth against the plaintiffs'
libel allegations. The defendants tried to demon-
strate throughout the trial that the plaintiffs did
in fact have numerous ties to individuals with
organized crime backgrounds, that rumors of orga-
nized crime ties to Pine Knob originated long
before the publication of the Pine Knob series, and
that the articles contained no material falsehoods
or omissions of fact.

At the conclusion of the proofs, the trial court
instructed the jury that "[i]t is the Plaintiffs'
burden of proof to satisfy you by a preponderance
of the evidence that the statements or innuendoes
complained of were false in some material respect
and published with actual malice.[11] Plaintiffs will
not have satisfied their burden of proving material
falsity if you find that the Detroit News articles
were substantially true." The defendants moved
for a directed verdict, which the trial court took
under advisement pending the jury's return of a
verdict.

[11] See n 10.

The jury returned special verdicts in September 1985. It found in respect to plaintiff Francell that the Detroit News published the articles, that the articles contained false and defamatory statement(s), and that the defendants had knowledge that the statement was false or acted with reckless disregard regarding its falsity. The jury awarded Francell three million dollars in actual damages. With respect to plaintiff Locricchio, the jury awarded no damages after finding no publication, i.e., that the defendants did not disseminate false and defamatory facts to a third party through printing, writing, or pictures.

### C. THE TRIAL COURT'S DIRECTED VERDICT.

The trial court ruled on the defendant's motion for a directed verdict in December 1986. It approvingly cited the newly released Supreme Court decision in *Philadelphia Newspapers, Inc v Hepps,* 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986). From *Hepps,* the trial court extrapolated that "[w]here allegedly defamatory speech is of public concern, the First Amendment demands and Michigan law requires that the plaintiff, whether public official, public figure, or private individual, prove the statements at issue to be false." The trial court then held that "the plaintiffs have failed to prove the publications at issue contained significantly false facts, and a verdict must be directed for the defendant."

The trial court further stated that "[i]nsinuation, imputation, or inference may be as defamatory as a direct unveiled assertion." The trial court nevertheless concluded that "liability cannot be imposed for journalistic inferences arising from the reporting of true facts about matters of public interest and concern. The plaintiff must prove the

false impression arises from untrue, or undisclosed facts."

The trial court then compiled a fourteen-paragraph list of facts that it found "are true; or, at least, [that] the plaintiffs have not proven them to be false." The court concluded:

[1] Plaintiffs purchased Pine Knob from individuals who had been indicted by a federal grand jury for concealing their ownership interests in a Las Vegas hotel.

[2] Plaintiffs' names appeared on the organized crime lists of the Federal Bureau of Investigation.

[3] Plaintiffs were personal friends of, or had done business with, innumerable individuals whose names are commonly associated with organized crime, including Leonard Schultz, Dominic Corrado, Joseph Burnett, Fred Gordon, James Tamer, Charles Goldfarb, Harvey Leach, Charles Monazym and Jack Tocco.

[4] In the course of their investigations, agents of the Federal Bureau of Investigation spoke with plaintiffs' bankers and referred to plaintiffs' as "crooks."

[5] A federal grand jury indicted plaintiffs on three counts of filing false statements on a loan application made to Detroit Bank & Trust.

[6] Plaintiffs pleaded guilty in federal court to giving false information on an application for a loan, in violation of Federal law.

[7] The bulk of the financing required to develop Pine Knob occurred after the publication of the 1972 Detroit News Article that plaintiffs claim caused "all their problems."

[8] Plaintiffs' names surfaced in the investigations of both the Agnes Brush and Harvey Leach murders. The Detroit News, in its coverage of those two investigations, never identified plaintiffs as suspects, but the Detroit News did identify (at that time and in the 1979 series) a 61 year old laborer as the only suspect in the Agnes Brush murder.

[9] Plaintiffs told the Federal Bureau of Investigation in 1973 that they were already then tired of hearing rumors that organized crime was connected with their business.

[10] Plaintiffs furnished a legal memorandum and statements by their attorneys confirming for The Detroit News their allegations that the Federal Bureau of Investigation had harassed them by visiting their lenders and bankers from 1973 through 1977.

[11] Joseph Locricchio admitted in previous testimony and in this trial that he knew of the Federal Bureau of Investigation['s] special interest in James Tamer and of the agency's investigation into hidden ownership of the Aladdin Hotel and Casino before he went to Las Vegas at James Tamer's request.

[12] Despite speculation to the contrary, the only evidence on record shows plaintiffs were turned down in 1976, well before the complained of publications, for loans because of "high living," a reputation that they were not prompt with payment of their debts, and rumors of organized crime involvement. No evidence has been introduced, and no banker has testified that they relied on the complained of publications in turning down plaintiffs' loan applications.

[13] Plaintiffs admit a separation between themselves and their primary lender, Borg Warner, for acts prior to May, 1978 and resulting legal actions in which plaintiffs attributed millions of dollars in damage to the businesses to Borg Warner.

[14] Plaintiffs admit filing a lawsuit against the Hilton Hotel chain, The Reminder Newspaper, and several individuals, blaming them for the defeat of the referendum that would have allowed plaintiffs proposed hotel and for causing plaintiffs $100,000,000 in damages.

### D. THE COURT OF APPEALS REVERSAL OF THE DIRECTED VERDICT.

The plaintiffs appealed the trial court's ruling,

and the Court of Appeals issued a two-page opinion overturning the trial court and reinstating the jury verdict in February 1989. In the view of the Court of Appeals

> [t]he legal question in this case was whether plaintiffs could have a cause of action for libel where their allegations of defamation were not based on a specific false statement in any particular article.

The Court reversed the trial court's directed verdict because, "[o]ur first opinion in this case answered that question affirmatively."

The Court of Appeals further opined that "the United States Supreme Court's decision in *Philadelphia Newspapers, Inc, supra,* [does not] bar[ ] a suit for defamation by implication." The Court of Appeals held accordingly that "[i]n light of our previous opinion and our belief that subsequent law has not eliminated defamation by implication, we reverse the trial court's order granting [the directed verdict] and reinstate the jury's verdict."

### III. ANALYSIS

#### A. THE LAW OF THE CASE DOCTRINE, LIBEL VERDICTS, AND INDEPENDENT APPELLATE REVIEW.

The trial court, in effect, independently reviewed the record to determine whether the jury's verdict conformed to the constitutionally mandated burden of proof regarding falsity. In contrast, the Court of Appeals implicitly relied on the law of the case doctrine to reverse the trial court's directed verdict by adverting to its prior summary judgment ruling that a cause of action exists for

defamation by implication. This Court noted in *CAF Investment Co v Saginaw Twp,* 410 Mich 428, 454; 302 NW2d 164 (1981), that the law of the case doctrine

> [a]s generally stated, [provides that] if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same.

The law of the case doctrine exists primarily to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."[12] In this sense, the law of the case doctrine is an analytical cousin of the doctrines of claim and issue preclusion. However, as Justice Holmes recognized almost a century ago, unlike the later doctrines, the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."[13]

We do not here question the generally sound principles of efficiency, comity, and finality that animate the law of the case doctrine. However, in a libel case affecting constitutionally protected public discourse, the law of the case doctrine should not have precluded a second review by a subsequent Court of Appeals panel. Indeed, in such cases the law of the case doctrine must yield to a

---

[12] Wright, Miller & Cooper, Federal Practice & Procedure, § 4478, p 788.

[13] *Messenger v Anderson,* 225 US 436, 444; 32 S Ct 739; 56 L Ed 1152 (1912). See also *Safir v Dole,* 231 US App DC 63; 718 F2d 475 (1983) (the law of the case doctrine is discretionary and does not preclude courts from reëxamining issues that address their constitutional power).

competing doctrine: the requirement of independent review of constitutional facts.[14]

The determination on summary judgment that the plaintiffs' complaint stated a cause of action for defamation by implication should not have abrogated the appellate court's duty to independently review the record to determine whether, in fact, the plaintiffs carried their burden of proof at trial regarding falsity at the posttrial directed verdict stage.[15] The application of the law of the case doctrine in this case clearly contravened the principle enshrined in the celebrated case of *New York Times Co v Sullivan*, 376 US 254, 270; 84 S Ct 710; 11 L Ed 2d 686 (1964), that discourse on matters of public interest should remain "uninhibited, robust, and wide-open . . . ."

*Sullivan* announced that appellate courts must conduct an independent review of the record to ensure that no "forbidden intrusion on the field of free expression" has occurred in libel cases involving the issue of actual malice. *Id.* at 285.[16] *Sullivan* mandated that reviewing courts in libel cases " 'examine for [themselves] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.' " *Id.*

The Supreme Court strongly reiterated the requirement of independent review in *Bose Corp v Consumers Union of United States, Inc*, 466 US

[14] *Harte-Hanks Communications, Inc v Connaughton*, 491 US 657, 688; 109 S Ct 2678; 105 L Ed 2d 562 (1989). "In determining whether [a] constitutional standard has been satisfied, the reviewing court must consider the factual record in full."

[15] In any event, the law of the case doctrine does not bind this Court upon review of a decision of the Court of Appeals.

[16] The actual malice standard of *Sullivan* requires a public figure or official to first establish a false utterance, and, second, to prove that "it was [made] with reckless disregard of whether it was false or not." 376 US 280.

485, 505, 514; 104 S Ct 1949; 80 L Ed 2d 502 (1984). *Bose* held that "the clearly-erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times Co v Sullivan.*" The *Bose* Court reasoned that "[t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' " *Id.* at 511.

Similarly, in *Harte-Hanks Communications, Inc v Connaughton,* 491 US 657, 686; 109 S Ct 2678; 105 L Ed 2d 562 (1989), the Supreme Court reviewed the entire record to determine if the evidence supported a finding of actual malice. The Court reaffirmed that "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Id.* at 685. The Court reiterated that "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of ' "breathing space" ' so that protected speech is not discouraged." *Id.* at 686.[17]

---

[17] Certainly, the *Harte-Hanks* Court "construed the constitutional mandate of independent appellate review very narrowly" as compared to *Bose* and *Sullivan.* Rassel, Stewart & Niehoff, Connaughton v Harte-Hanks *and the independent review of libel verdicts,* 20 U Tol L R 681, 694 (1989).

The concurring opinion of Chief Justice CAVANAGH advances *Harte-Hanks* for the proposition that appellate courts "need *not* independently review 'the historical facts—e.g., who did what to whom and

We recognize that, unlike the instant case, the cases from *Sullivan* to *Harte-Hanks* involved public figures and, accordingly, mandated independent review for the issue of actual malice. In *Gertz v Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974), the Court held that the actual-malice standard of liability for actual damages articulated

when . . . .'" *Post,* p 136, citing the concurring opinion of Justice White. Initially, it must be said that our reading of *Harte-Hanks* does not find that "four concurring justices made explicitly clear" that they agree with Justice White's concurrence. In any event, even Justice White, with whom Chief Justice Rehnquist *alone* concurred conceded that the "reckless disregard component of the . . . 'actual malice' standard is *not* a question of historical fact." *Id.* at 694. (Emphasis added.)

Second, appellate analysis of actual malice in libel cases necessarily involves a threshold determination of falsity, since proof of actual malice requires proof of both falsity and reckless disregard of falsity. Third, in reviewing a libel verdict an appellate court does not and should not exercise review of credibility determinations, disregard previous factfindings, or create new factfindings. Rather, the court should exercise independent judgment regarding whether, as a matter of constitutional law, the evidence in the record supports the verdict. The Court of Appeals in this case failed to perform an independent evaluation of the evidence in accordance with the constitutional principles enumerated in this opinion.

The trial court, in contrast, clearly conducted an independent review of the existing record. The concurrence suggests that independent review of the burden of proving falsity inherently involves reviewing credibility of witnesses. Yet the record emphatically demonstrates that the trial court did not examine credibility in its independent review of the jury's verdict. Its evaluation concerns not primarily "who did what to whom and when," but whether a constitutionally permissible quantum of evidence supported a judgment consistent with libel law and First Amendment principles. As the *Bose* Court noted, "the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." 466 US 501; see also *Time, Inc v Pape,* 401 US 279, 284; 91 S Ct 633; 28 L Ed 2d 45 (1971): "[I]n cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review 'the evidence in the . . . record to determine whether it could constitutionally support a judgment' for the plaintiff." The task of the reviewing appellate court in a libel case is not to conduct an inquiry regarding who did what to whom, but rather to independently examine the record as a whole to insure that the burden of proof with respect to falsity has been satisfied.

in *Sullivan* does not govern cases, such as the instant one, that involve a media defendant's report on a matter of public interest concerning a private-figure plaintiff.

However, in *Philadelphia Newspapers, Inc, supra* at 768-769, the Supreme Court held that "where a newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages without also showing that the statements at issue are false." In abrogating the common-law presumption of falsity in libel cases, the Court in *Hepps* created an issue of constitutional fact regarding whether a plaintiff carries the burden of proving falsity.

We therefore conclude that an independent appellate review of the burden of proof with regard to falsity in private-figure, public-interest cases deters "forbidden intrusion on the field of free expression" as a logical corollary to independent review of actual malice. *Sullivan, supra* at 285. The Court recognized in *Hepps,* that imposing liability for true statements amounts to the imposition of liability without fault proscribed by *Gertz.* A jury verdict against the great weight of the evidence regarding the falsity requirement, unreviewed by a court, would therefore comprise a forbidden intrusion on protected speech, in the same way as would a failure to review for clear and convincing evidence of actual malice.[18]

In *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157; 398 NW2d 245 (1986), this Court,

[18] The logic of *Anderson v Liberty Lobby, Inc,* 477 US 242, 252; 106 S Ct 2505; 91 L Ed 2d 202 (1986), supports this reasoning. In *Anderson,* the Court was "convinced that the inquiry involved in a ruling on a motion for summary judgment *or for a directed verdict* necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. . . . The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." (Emphasis added.)

following *Gertz,* rejected the actual-malice standard of liability in cases involving private-figure plaintiffs and a media defendant's report on matters of public interest.[19] Our rationale in *Rouch* in part rested on an acknowledgment of the "even greater protection" afforded defamation defendants by the burden of proof as to falsity. *Id.* at 198. That protection would indeed ring hollow if, at least in cases implicating public-interest subject matter and media defendants, no effective review existed to ensure compliance with the burden of proof.[20] The Court of Appeals application of the law of the case doctrine accordingly fails to accord the necessary "breathing space" to protected speech. The principle of independent review logically extends to determining whether a plaintiff satisfies the burden of proving falsity. *Id.*

A remand in this case of plaintiffs' libel claims for further proceedings on the merits would normally flow from our determination that the Court of Appeals erred in relying on the law of the case doctrine to reverse the trial court.[21] However, in

---

[19] *Rouch* designated negligence as the applicable standard of liability for actual damages in such cases. The standard of liability is thus now settled law in Michigan and not at issue in this case.

[20] It is worth noting in this connection that the doctrine of independent review reflects an inherent distrust of allocating unlimited decisional power to juries in the First Amendment context. Thus, "much of contemporary first amendment doctrine, theory, and commentary is devoted to protecting speech *from* the jury. . . . The common wisdom is that if juries were given more decisional power in [First Amendment cases], either by increasing the range of issues they could consider or by granting juries greater immunity from appellate review, free speech would suffer a crippling blow." Schauer, *The role of the people in First Amendment theory,* 74 Cal L R 761, 765 (1986).

[21] Amicus curiae, Michigan Trial Lawyers Association, incorrectly suggests that *Bufalino v Detroit Magazine, Inc,* 433 Mich 766; 449 NW2d 410 (1989), mandates a remand in this case. The *Bufalino* majority acknowledged explicitly that "[w]e can, as a practical matter, simply decide the merits of the issue on the basis of the record before us." *Id.* at 774. Moreover, unlike *Bufalino,* a summary judgment case, the instant case comes before us after extensive pretrial and posttrial arguments.

the interest of clarifying the operation of constitutional principles under the facts of this case, of judicial economy, and of the long-suffering litigants, we bypass this customary procedure and conduct an independent review and analysis of the record in the following sections.

### B. ANALYSIS OF THE PLAINTIFFS' DEFAMATION CLAIMS.

An analysis of the plaintiffs' defamation by implication claims requires an examination of three interlocking factors: the elements of libel under Michigan law, constitutional requirements and principles informing and attenuating Michigan libel law, and the contours of defamation by implication as shaped by the two preceding factors. Our examination of the legal principles of libel law in Michigan, as informed by the First Amendment, leads us to conclude that defamation by implication in private-figure/public-interest media cases requires proof of both defamatory meaning and falsity, a burden not carried by plaintiffs under these facts.

### 1. THE ESSENTIAL ELEMENTS OF LIBEL: DEFAMATORY MEANING AND FALSITY.

Michigan law has traditionally defined a defamatory communication as one which " 'tends so to harm the reputation of [persons so] as to lower [them] in the estimation of the community or to deter [others] from associating or dealing with [them].' " *Nuyen v Slater,* 372 Mich 654, 662, n *; 127 NW2d 369 (1964). A cause of action for libel encompasses four components: 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3)

fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. A cause of action for libel requires a plaintiff to show defamatory meaning as well as falsity, fault, and publication.

Michigan law has also long recognized that the regime of libel law may not impose damages for injuries to reputation arising from a press report of materially true facts about a public figure on a matter of public interest. In *Sanders v Evening News Ass'n, supra* at 337, a former judge of the Common Pleas Court sued the Detroit News for two newspaper articles that exposed " 'the problem of overnight releases of persons arrested for misdemeanors—releases made by the police at the telephoned request of judges.' " Both articles reported an incident where the plaintiff personally intervened to order the release of a person held in custody at a police station. The first article reported that " 'former Judge Joseph Sanders walked into Bethune Station one night, banged his gavel on the startled sergeant's desk and shouted: " ' "Court's in session, the Honorable Joseph Sanders presiding. Bring in Joe Doakes!" ' " *Id.* at 339.

The second article, appearing the following day, stated that " '[there has almost always] been a judge or two, bound to a bondsman or lawyer either by affection or campaign contribution, or overimpressed by judicial prerogatives, who has turned the order (of the head of the police department not to release on telephone request) into a farce. Witness the case of . . . the impromptu court session held in Bethune Station by former Judge Joseph Sanders.' " *Id.*

The *Sanders* Court reviewed the record and concluded that no liability existed for the first

article "because in his amended declaration plaintiff admits the truth of the . . . publication in so far as it could possibly tend to support an action for libel. Since that publication was true, it was not libelous." *Id.* at 340.

The Court then reviewed the substance of the second article, under the venerable principle that " '[t]o test its libelous quality, a publication is to be considered as a whole, including the character of the display of its headlines when the article is published in a newspaper . . . .' " *Id.* The Court first held that the plaintiff lacked authority to hold court in a police station to release a prisoner, and therefore had acted in his private, not official capacity. It concluded that "[i]n doing so plaintiff acted without lawful authority and it was not libelous for defendants to publish an article to that effect . . . [f]urther, it was not libelous to say in the alternative of plaintiff 'or (he was) over-impressed by judicial prerogatives' since such appears to be the truth from plaintiff's own pleading." *Id.* at 342-343.

The logic of *Sanders,* while instructive, does not foreclose every cause of action for defamation by implication. However, the *Sanders* rationale does prohibit imposing liability on a media defendant for facts it publishes accurately and without material factual omissions about public affairs.

### 2. CONSTITUTIONAL LIABILITY REQUIREMENTS: PUBLIC DISCOURSE, PRIVATE PLAINTIFFS, AND THE BURDEN OF FALSITY.

In addition to satisfying Michigan libel law elements, this private-figure/public-interest subject matter libel case must also comply with the constitutional elements of libel law, including falsity and the burden of proof. The common-law roots of

defamation have been fundamentally altered by a series of cases from the highest court in the land, beginning with *Sullivan, supra.* The Supreme Court's First Amendment analysis of libel cases since *Sullivan* has variously employed three important factors to define the parameters of libel liability: the public- or private-figure status of the plaintiff, the media or nonmedia status of the defendant,[22] and the public or private character of the speech. The Court has most consistently interpreted the First Amendment to accord maximum protection to public speech about public figures.[23]

The Court has acted more ambiguously in the context of private-figure plaintiffs, as presented in this case. In *Gertz,* the Court focused on the status of the plaintiff and concluded that private-figure plaintiffs deserve more reputational protection than do public-figure plaintiffs for two reasons. First, the Court postulated that unlike public figures, private-figure plaintiffs lack access to "channels of effective communication" that would allow them "a more realistic opportunity to counteract

[22] It can hardly be disputed that the Supreme Court has rarely "breathed life into the [First Amendment's] press clause [so as to provide] the outlines of a press-speech distinction." Note, *Press to trial: The press clause, the libel dilemma, and the media-nonmedia distinction,* 39 Syracuse L R 795, 812 (1988). Nevertheless, much of the Court's libel jurisprudence has unequivocally sought to constrain publishers from imposing anti-free speech " 'self-censorship.' " *Sullivan, supra* at 279. See, e.g., *Gertz, supra* at 347 (explicitly restricting its holding to media defendants), *Hepps, supra* at 779, n 4 ("Nor need we consider what standards would apply if the plaintiff sues a nonmedia defendant"). See also note, Philadelphia Newspapers v Hepps *revisited: A critical approach to different standards of protection for media and nonmedia defendants in private plaintiff defamation cases,* 58 Geo Wash L R 1268, 1281 (1990): "[A]lthough the [Supreme] Court has never clearly embraced the media-nonmedia distinction, it has never explicitly rejected it either."

[23] See, e.g., *Hepps* at 775. "When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law."

false statements . . . ." *Id.* at 344. Second, unlike ·public figures, private-figure plaintiffs do not voluntarily expose themselves to the risk of defamation by injecting themselves into public controversy. The Court concluded that "[p]rivate individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." *Id.*

Just as the Court has postulated that private-figure plaintiffs deserve greater libel law protection vis-à-vis public-figure plaintiffs, it has also consistently recognized that speech on matters of public concern merits heightened protection under the First Amendment. The Court has declared, for example that the First Amendment "embraces at the least the liberty to discuss publicly . . . all matters of public concern,"[24] and similarly that "expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.' "[25]

The Court's protection of speech on the basis of its public character reached its zenith in the plurality opinion of *Rosenbloom v Metromedia, Inc,* 403 US 29; 91 S Ct 1811; 29 L Ed 2d 296 (1971). The plurality in *Rosenbloom* suggested that the actual-malice standard articulated in *Sullivan* should extend to both private- and public-figure plaintiffs if the defamatory statement involved "matters of public or general concern." *Id.* at 44. The Court repudiated this position in *Gertz,* and instead focused on the plaintiff's public or private status to set the standard of liability. However, in *Hepps,* the Court again emphasized the public

[24] *Thornhill v Alabama,* 310 US 88, 101; 60 S Ct 736; 84 L Ed 1093 (1940).

[25] *NAACP v Claiborne Hardware Co,* 458 US 886, 913; 102 S Ct 3409; 73 L Ed 2d 1215 (1982). See also *Thornhill,* n 24 *supra; Rosenblatt,* n 1 *supra* at 85: "There is, first, a strong [constitutional] interest in [protecting] debate on public issues . . . ."

character of the speech (and the danger of media self-censorship) to set the applicable burden of proof with regard to falsity.

Similarly, in *Dun & Bradstreet, Inc v Greenmoss Builders, Inc,* 472 US 749, 759; 105 S Ct 2939; 86 L Ed 2d 593 (1985), the Court emphasized that speech on matters of public concern lies at the heart of the First Amendment, while, "[i]n contrast, speech on matters of purely private concern is of less First Amendment concern." While *Gertz* prohibited the imposition of punitive damages in private-figure/public-interest cases absent a showing of actual malice, *Dun & Bradstreet* held that "permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." *Id.* at 763.

The United States Supreme Court has also "consistently sought to ensure that liability does not arise from true speech on public matters."[26] In *Sullivan, supra* at 271, the Court stated unequivocally:

> Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth . . . and especially one that puts the burden of proving truth on the speaker.

Similarly, in *Garrison v Louisiana,* 379 US 64, 74; 85 S Ct 209; 13 L Ed 2d 125 (1964), the Court noted that "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." More recently, "[b]oth [*Hepps*] and [*Dun & Bradstreet*] evince a special solicitude for speech of public concern and

---

[26] Note, n 7 *supra,* 62 NYU L R 812, 829 (1987).

desire to ensure such speech adequate breathing space, the one by its allocation of burden of proof, the other by its limitation on damages."[27] In parallel fashion, this Court has long recognized, as in *Sanders,* that Michigan law prohibits libel liability for true speech on matters of public concern.

Although the Court has stated clearly that true speech about matters of public concern may not subject a speaker to libel sanctions, it has paradoxically more extensively elucidated the standard of fault than it has the quantum or quality of falsity in libel cases.[28] At best, it can be said that the Court has struggled analytically to balance private reputational interests against public free expression in the context of falsity. On the one hand, the Court has asserted that "[f]alse statements of fact" are constitutionally valueless because such statements "interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective."[29] On the other hand, the Court has also asserted that "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz, supra* at 341.

The more recent decision in *Hepps* clearly indi-

[27] Note, *The fact-opinion determination in defamation,* 88 Colum L R 809, 833 (1988).

[28] See, e.g., *Hepps, supra* at 775: "Our opinions to date have chiefly treated the necessary showings of fault rather than of falsity." The actual-malice inquiry of public-figure cases generally focuses on the actions and state of mind of the publisher rather than the quantum of proof of falsity adduced by the plaintiff. See, e.g., *Herbert v Lando,* 441 US 153, 176; 99 S Ct 1635; 60 L Ed 2d 115 (1979) (requiring plaintiffs in defamation actions to "focus on the editorial process and [to] prove a false publication attended by some degree of culpability").

[29] *Hustler Magazine, Inc v Falwell,* 485 US 46, 52; 108 S Ct 876; 99 L Ed 2d 41 (1988). The Holmesian concept of the "marketplace of ideas" plays a central role in all First Amendment jurisprudence. See, e.g., *Abrams v United States,* 250 US 616, 630; 40 S Ct 17; 63 L Ed 1173 (1919) (Holmes, J., dissenting).

cates adherence to the latter paradigm of protecting some degree of falsity to ensure greater First Amendment protection of speech on public interest matters. The Court in *Hepps, supra* at 776, recognized that "forcing the plaintiff to bear the burden of showing falsity [will result in some cases where] plaintiffs cannot meet their burden despite the fact that the speech is in fact false." Nevertheless, the Court ultimately concluded "that the Constitution requires us to tip [the scales] in favor of protecting true speech," despite the dispositive nature of burden of proof in cases presenting ambiguous evidence regarding falsity. *Id.* In this connection, it seems clear that claims of defamation by implication, which by nature present ambiguous evidence with respect to falsity, face a severe constitutional hurdle.

As noted previously, the requirement that a private plaintiff suing a media defendant for libel in a public interest matter would have to "prove as part of his case, in addition to defendant's fault, that the statements at issue are false" comprised an important factor for our decision in *Rouch* to strip public interest statements of heightened actual malice protection from liability. *Rouch, supra* at 204. However, although *Hepps* "stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law . . . where a media defendant is involved,"[30] neither *Hepps* (nor our decision in *Rouch*) specified whether the standard of proof with regard to falsity is " 'clear and convincing evidence' or some lesser standard."[31] We need not address that issue in this case because the record does not reveal that the plain-

---

[30] *Milkovich v Lorain Journal Co,* 497 US 1, —; 110 S Ct 2695; 111 L Ed 2d 1, 18 (1990).

[31] Prosser & Keeton, Torts (5th ed), 1988 supp, § 116A, p 117.

tiffs proved any material falsity by even a preponderance of the evidence.

### C. DEFAMATION BY IMPLICATION.

#### 1. THE COURT OF APPEALS ANALYSIS.

The Court of Appeals recognized that a number of cases have held that a cause of action exists for defamation by implication.[32] However, the cases it relied on bear little relation to the case presented here. The 1947 case of *Caldwell v Crowell-Collier Publishing Co, supra,* has little, if any precedential value to present libel law or to the case at bar. In that case, Caldwell, the Governor of Florida, sued a magazine for its editorial contrasting Caldwell's expressed social views on a racial lynching in Florida to those of his counterpart governor of North Carolina. The editorial stated:

> "[Governor Caldwell] said he did not consider [the incident] a lynching. He went on to opine that the mob had saved courts, etc., considerable trouble . . . [t]hus [Governor] Cherry of North Carolina expresses the forward-looking view of these matters, while Caldwell of Florida expresses the old narrow view which has been about as harmful to southern white people as to southern negroes [sic]." [*Id.* at 334.]

The federal circuit court held that Caldwell had asserted an action for libel, noting that "[i]f the imputations published hold the Governor up as indifferent to a lynching in his State . . . they grievously reflect on him in his office, and if false

[32] As will be seen, we do not, and need not, disagree in theory with the conclusion of the Court of Appeals that a cause of action for libel by implication might succeed without a direct showing of false statements. We do disagree with its failure to conduct a review of the sufficiency of the evidence of falsity for any such libel by implication, as did the trial court.

and unprivileged are actionable per se, injury and damage being implied." *Id.* at 336.

It is doubtful that the *Caldwell* decision comprises good law today, and in any event its facts have little bearing on the instant case. *Caldwell* involved a public-figure plaintiff, whereas this case involves private figures. The old common-law presumption of damages no longer controls libel cases involving public figures, having been supplanted by the *Sullivan* actual-malice requirement. Moreover, the burden of proof of falsity now lies with the plaintiff, not with the defendant as in *Caldwell*. Finally, unlike the instant case, the plaintiff in *Caldwell* did in fact allege specific false statements of fact and material omissions.

The Court of Appeals also relied on *Memphis Publishing Co v Nichols,* 569 SW2d 412 (Tenn, 1978), in its summary judgment and reversal of the directed verdict for the defendants. *Nichols* involved a plaintiff's suit for libel against a newspaper that published an account of a domestic shooting. The news account reported that

> "[the shooting incident] took place Thursday night after the suspect arrived at the [plaintiff's] home and found her husband there with Mrs. Nichols. Witnesses said the suspect first fired a shot at her husband and then at Mrs. Nichols, striking her in the arm, police reported." [*Id.* at 414.]

Mrs. Nichols sued the paper, arguing that the article "falsely implied that Mrs. Nichols and . . . the assailant's husband, were having an adulterous affair, and were 'caught' by [the assailant]." The proofs at trial showed that "not only were Mrs. Nichols [and the assailant's husband] at the Nichols' home but so, also, were Mr. Nichols and two neighbors, all of whom were sitting in the

living room, talking, when [the assailant] arrived around three o'clock in the afternoon." *Id.*

The Tennessee Supreme Court rejected the newspaper's argument that "every material fact in the article quoted . . . was true." The court concluded that "[t]he publication of the complete facts could not conceivably have led the reader to conclude that Mrs. Nichols and Mr. Newton had an adulterous relationship. The published statement, therefore, so distorted the truth as to make the entire article false and defamatory." *Id.* at 420.

As in the instant case, *Nichols* involved a private-figure plaintiff suing a media defendant about a matter of public interest. However, while well reasoned, the *Nichols* case incorrectly states the current law of libel with respect to the burden of proving falsity. In *Nichols* (a 1978 case), the court asserted that a plaintiff "need not show . . . that the statement is false. There is a legal presumption of falsity which the defendant may rebut by proving truth as a defense." *Id.* at 420. As indicated earlier, *Hepps,* obliterated the common-law presumption of falsity in libel actions.

Moreover, the defamatory implication alleged by the plaintiff in *Nichols* identified clear-cut and specific material omissions of reported facts, in contrast to the plaintiffs' claims in this case. The information omitted from the *Nichols'* report damaged the plaintiffs' reputation as effectively as a direct false statement. The defendant's article would have conveyed an undisputedly nondefamatory meaning had it reported that Mrs. Nichols' husband and other people were present during the shooting.

In contrast, in the instant case, the plaintiffs have failed to identify or prove material omissions which, if published, would have rendered the Pine Knob series nondefamatory. *Nichols* arguably

stands for the proposition that material omissions from reports of true facts are capable of creating a defamatory impression. In the instant case, however, the plaintiffs have not shown that material omissions occurred or how they operated to defame them.

Both the trial court and the Court of Appeals obliquely referred to *Herbert v Lando,* 781 F2d 298 (CA 2, 1986).[33] While not precisely on point, *Herbert,* a public-figure/actual-malice case, is instructive with regard to the operative significance of claims of defamation by implication. Herbert, a retired Army colonel who served in Vietnam, sued CBS and the Atlantic Monthly for print and broadcast reports that cast doubt on the truth of Herbert's claims that military superiors relieved him of his command for reporting war crime atrocities.

Unlike the instant plaintiffs, Herbert specified nine defamatory statements he claimed the defendants published with actual malice. The district court and the federal circuit court rejected each of these claims. Moreover, they rejected Herbert's claims that the overall defamatory effect of the reports comprised a separate basis for recovery.

The federal circuit court distinguished "an overall defamatory impact" from "a particular defamatory implication . . . ." It reasoned that in certain circumstances, "a combination of individual statements [not in themselves defamatory] might lead the reader to draw an inference that is damaging to the plaintiff." However, the court reasoned that

[33] It must be noted here that no consensus exists within the various federal circuits on the issue of defamation by implication. See, e.g., *Price v Viking Penguin, Inc,* 881 F2d 1426, 1432 (CA 8, 1989), cert den 493 US 1036 (1990) (refusing to recognize defamation by implication). *Pierce v Capital Cities Communications, Inc,* 576 F2d 495 (CA 3, 1978), cert den 439 US 861 (1978); *Woods v Evansville Press Co, Inc,* 791 F2d 480, 486 (CA 7, 1986) (an implied statement, just as a statement made in direct language, can be defamatory).

no cause of action would lie where "the defamatory 'impact' of the publication is the same as the defamatory implication conveyed by each of the individual statements." *Id.* at 307. Because the court had previously found that each defamatory implication alleged by the plaintiff had not been published with actual malice—i.e., reckless disregard of falsity, it concluded that "[t]o permit Herbert to rest a cause of action . . . on the publication's 'overall impact' would be a meaningless gesture, since the defamatory implications of the specific statements and the overall impact of the publications are identical." *Id.* at 308.

Although the *Herbert* court recognized the possibility of an "overall impact" separate and apart from the "implications of the specific statements," it applied the same standard of fault—in that case actual malice—to both types of defamation.

## 2. CASES CITED BY THE PLAINTIFFS.

The plaintiffs mistakenly argue that "no constitutional issue is raised by this appeal, and the only legal question [presented] is whether, under the common law of Michigan, implication, insinuation or inference may support a defamation action." On the contrary, the legal question presented whether, in alleging defamation by implication, the plaintiffs carried their burden of proving falsity, is one of constitutional import. In cases challenging reports by the media on matters of public interest, the decision in *Hepps* dictates that a private-figure plaintiff bears the burden of proving falsity.

Many of the cases cited by the plaintiffs for the proposition that a cause of action exists for defamation by implication have little bearing on this case. *Randall v Evening News Ass'n,* 79 Mich 266;

44 NW 783 (1890), involved a cartoon that implied a legislator had improperly received funds from the alcohol lobby. The logic of *Sullivan* would clearly foreclose that case today absent a showing of falsity and actual malice. *Bronkowski v Arlan's Dep't Store,* 12 Mich App 88; 162 NW2d 347 (1968), and *Smith v Fergan,* 181 Mich App 594; 450 NW2d 3 (1989), involved private-figure plaintiffs alleging libel for purely private-interest matters. As noted earlier, the logic of *Dun & Bradstreet, supra,* suggests that the private-figure/private-interest subject matter configuration does not trigger heightened First Amendment scrutiny. *Hodgkins Kennels, Inc v Durbin,* 170 Mich App 474; 429 NW2d 189 (1988), another case cited by plaintiffs, properly read, does not involve claims of defamation by implication.

The plaintiffs' arguments often confuse the issue of defamatory meaning with the issue of falsity. The plaintiffs cite *Schultz v Reader's Digest Ass'n,* 468 F Supp 551, 554 (ED Mich, 1979), where the district court held that a published article's "impression that Mr. Schultz may have been involved in 'setting up' Jimmy Hoffa to be murdered . . . is clearly defamatory." However, even assuming that the Pine Knob series as a whole conveyed a defamatory impression, the plaintiff still bears the burden of proving underlying falsity.[34]

Ironically, the plaintiff also cites *Dougherty v Capitol Cities Communications, Inc,* 631 F Supp

---

[34] The Supreme Court's opinion in *Milkovich,* n 30 *supra,* illustrates this principle. The Court in *Milkovich* noted that "the issue of falsity relates to the defamatory facts implied by a statement. For instance, the statement, 'I think Jones lied,' may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery." *Id.,* 111 L Ed 2d 18, n 7.

1566 (ED Mich, 1986), for the proposition that "the defamatory tone of a radio broadcast which resulted from the omission of known facts was capable of supporting plaintiff's defamation action even though plaintiff could not point to a single specific statement in the broadcast that was defamatory and false." In *Dougherty,* the district court soundly trounced the plaintiff's arguments for defamation by implication after reviewing all the evidence, much as the trial court did in this case. As in this case, the court noted that "[a]lthough plaintiff painstakingly presents his version of the story behind each of the broadcasts . . . he does not succeed in uncovering any significant statement about him that is false." *Id.* at 1569. The court went on to hold that "it is impossible to discern any false information in the broadcasts. Each statement made had a factual basis, and where they were not factual statements, . . . they were [nonactionable statements of opinion]." *Id.* at 1576.

The plaintiffs also cite an extensive list of cases from other jurisdictions to illustrate that defamation by implication is a well-established cause of action. We note that many of these cases are inapplicable to the instant case because they involve either public figures, and focus on the issue of actual malice not at issue here,[35] or involve private plaintiffs on matters of private interest.[36]

[35] See, e.g., *Cochran v Indianapolis Newspapers, Inc,* 175 Ind App 548; 372 NE2d 1211 (1978), *Kelly v Iowa State Ed Ass'n,* 372 NW2d 288 (Iowa, 1985), and *Catalano v Pechous,* 83 Ill 2d 146; 419 NE2d 350 (1980). Similarly, the Chief Justice's concurrence urges application of *Strada v Connecticut Newspapers, Inc,* 193 Conn 313; 477 A2d 1005 (1984). However, our reading of *Strada* finds that case so replete with language about public figures as to provide virtually no guidance in the instant private plaintiff case.

[36] See, e.g., *Moritz v Medical Arts Clinic, PC,* 315 NW2d 458 (ND, 1982), *Geyer v Steinbronn,* 351 Pa Super 536; 506 A2d 901 (1986), and *Lewis v Equitable Life Assurance Co,* 389 NW2d 876 (Minn, 1986).

In any event, the questions whether a statement is capable of rendering a defamatory implication and whether, in fact, a plaintiff has proved falsity in an implication are separate inquiries. A plaintiff alleging defamation by implication must still prove material falsity. To do otherwise would allow a plaintiff to recover without a showing of falsity, in contravention of the rule announced in *Hepps.* Our review of the plaintiffs' proofs, conducted below, convinces us that the plaintiffs failed to make such a showing.

### 3. THE ALLEGED DEFAMATORY IMPLICATIONS.

The plaintiffs' primary claim is that the Pine Knob series as a whole falsely implied that plaintiffs were members or associates of organized crime. Although the plaintiffs initially declined to provide any specific allegations of falsity, they argue on appeal that the layout of the Pine Knob articles, including photographs and headlines, as well as the repetition of certain words such as "Mafia," "Sicilian," and "money wash," and indeed certain specific statements, contribute to the overall implication.

Unfortunately for the plaintiffs, an inescapable implication of the Pine Knob series conforms to the facts developed at trial: the plaintiffs had numerous financial and social connections with reputed organized crime figures and these associations contributed in the financing of Pine Knob and prompted intense investigative scrutiny, if not harassment, from law enforcement authorities.[37] Although capable of defamatory interpretation, the implications alleged by the plaintiffs do not

[37] The evidence at trial indicated that investigative interest by law enforcement agencies (and the resulting adverse effect on the ability of the plaintiffs to obtain traditional sources of financing) predated the publication of the Pine Knob series by a number of years.

arise from false facts or material omissions, and, standing alone, are not even proven by the plaintiffs to be false.

The plaintiffs it would seem, want to have it both ways regarding their defamation by implication claims. On the one hand, they assert that the articles as a whole disseminate false implications. On the other, they point to statements or headlines in isolation from the whole, such as the use of the word "lent" in the statement that "[s]everal investors associated with organized crime . . . either lent or helped Locricchio and Francell raise large sums of money." However, the plaintiffs did directly or indirectly obtain loans and other financial assistance from reputed organized crime figures. Construing the articles as a whole, the plaintiffs have failed to show false implications by a preponderance of the evidence.

Similarly, the headlines in the series, while arguably inflammatory, do not convey false implications apart from the context of the reported facts. The two partners did indeed, through "hustle" create "a big resort, millions in debts and a question: 'Is it Mafia?'" The partners did indeed attempt to create a "money wash" by obscuring the source of the Magill loan. The partners did indeed have a "brush with bankruptcy" in the course of financing Pine Knob. While the headline that the partners were "stalked by Mafia-hunters" was somewhat misleading, since the "Mafia-hunters" were not stalking the plaintiffs, the headline falls into the category of permissible rhetorical hyperbole.

The most troubling aspect of the Pine Knob series lies in the photograph in the second article of the automobile under the caption, "Harvey Leach's car was found with his body in the trunk." Reporter Wendland conceded that the picture

should have said, "in 1974," and it is also troubling that the caption did not say where the murder occurred. Again, however, the articles must be construed as a whole, and the article later pointed out that intensive investigations by law enforcement agencies failed to link the plaintiffs to the Leach (or Brush) murders.[38]

### 4. THE BURDEN OF PROVING FALSITY IN DEFAMATION BY IMPLICATION.

It has been said that "there is a great deal of the law of defamation which makes no sense."[39] One might say the same of the case law regarding defamation by implication. As noted earlier, the federal circuits and the various state courts remain divided over both the viability and the analytical contours of a cause of action for defamation by implication.[40] For our part, we are not convinced that defamation by implication is so analytically distinct from defamation by explicitly false facts as to require a departure from the guiding principles of general libel and First Amendment libel law. In the absence of clear authority to the contrary, and in light of the current contours of First Amendment libel law, we conclude that an action for defamation by implication must still conform to the three guiding constitutional principles discussed above: speech on public matters initiates heightened First Amendment protection,

[38] The statement that "a score" of agencies had investigated the Leach/Brush murders, while technically false, is not defamatory, in that it implies that many agencies tried, but failed, to link the plaintiffs to the murders, thus strengthening an inference that the plaintiffs did not in fact commit the murders.

[39] Prosser & Keeton, Torts (5th ed), p 771.

[40] See, e.g., note, *The art of insinuation: Defamation by implication*, 58 Fordham L R 677, 682-683 (1990): "Some courts permit and others prohibit a cause of action for defamation by implication. Unfortunately, they articulate their positions infrequently."

true speech on public affairs cannot accrue liability, and a plaintiff bears the burden of proving falsity. Additionally, a litigant alleging defamation by implication, like any other libel plaintiff, must demonstrate a statement or implication capable of defamatory meaning and prove falsity and fault by, at minimum, a preponderance of the evidence.[41]

The properly framed issue in this private-figure/public-interest media report case is not whether, in the abstract, a plaintiff can ever prevail by alleging defamation by implication, but rather whether the plaintiffs have proven both statements (or implications) capable of defamatory interpretation and falsity. Our review of the plaintiffs' arguments and the alleged defamatory implications lead us to agree with the trial court that the plaintiffs here failed to carry their burden of proving the falsity either of the statements or the implications at issue.

CONCLUSION

After a careful review of Michigan libel law, as informed by the latest constitutional pronouncements on the subject, it is our considered judgment that, to the extent this media defendant can be liable for defamation by implication arising from underlying published statements of fact not proven to be false and where no omission of material facts exist, such defamation by implication would at least have to pass the same standards of falsity,

[41] Our review has disclosed no case where a plaintiff prevailed by alleging defamation by implication without a showing of either direct or underlying material falsity, or a material omission of true facts. The question what standard of liability would most appropriately apply in such a case—actual malice or negligence—need not be addressed under the facts in this case, and thus remains a question for a future case.

fault, and burden of proof as would establish liability for defamation by statements of fact.

Under the heightened standard of appellate review required in public-interest libel cases, we conclude that the plaintiffs have failed to meet this burden, and, accordingly, we reverse the decision of the Court of Appeals and reinstate the trial court's directed verdict.

BOYLE, RILEY, and GRIFFIN, JJ., concurred with BRICKLEY, J.

CAVANAGH, C.J. (*concurring in the result*). I agree with the result reached by my Brother BRICKLEY's opinion. I reach that result, however, by a somewhat different route. For the reasons stated below, I believe plaintiffs' defamation claim is insupportable as a matter of law, and that defendants were entitled to pretrial summary judgment when they so moved in 1982.[1] I therefore agree that defendants are now entitled to a reversal of the Court of Appeals judgment presently before us, and a reinstatement of the circuit court's directed verdict. I adopt Justice BRICKLEY's thorough statement of the facts.

### I. APPELLATE REVIEW OF FALSITY

At the outset, I must respectfully disagree with my Brother BRICKLEY's conclusion that the underlying factual issue of falsity is subject to independent appellate review as a "constitutional fact" question. See *ante*, pp 109-113, 117-123. While I

[1] The circuit court denied defendants' second motion for summary judgment in 1982, and the Court of Appeals affirmed. We did not approve that decision, but simply denied interlocutory leave to appeal. 419 Mich 860 (1984). The United States Supreme Court denied certiorari. 469 US 1018 (1984). With the benefit of 20-20 hindsight, this Court, in my view, should have granted leave to appeal in 1984 and should have reversed the Court of Appeals decision at that time.

sympathize with the free speech concerns which animate my colleague's analysis, I believe that analysis blurs the distinction between a defamation plaintiff's acknowledged constitutional *burden* of proving falsity, and the nature of the issue of falsity itself.

As my colleague correctly notes, see *ante,* p 113, the First Amendment requires a defamation plaintiff, at least in a case involving speech of public concern, to bear the burden of proving falsity. See *Philadelphia Newspapers, Inc v Hepps,* 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986). It does not follow, however, from the fact that constitutional principles require a certain party to bear a certain burden of proof on a certain issue at trial, that an appellate court must or should independently review the merits of the issue. For example, in a criminal case the government is constitutionally required to bear the burden of proving the defendant's guilt beyond a reasonable doubt. Failure to so instruct the jury is grounds for reversal. See *In re Winship,* 397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970). But if the jury is properly so instructed and finds the defendant guilty, constitutional principles have never been thought to require appellate courts to independently review the underlying factual issue of guilt, and thereby substitute their judgment de novo for that of the jury. Rather, appellate courts apply the well-established "sufficiency of the evidence" standard, construing the evidence in the light most favorable to the verdict and asking only whether a rational jury could properly have reached that verdict. See *Jackson v Virginia,* 443 US 307, 318-319; 99 S Ct 2781; 61 L Ed 2d 560 (1979); *Glasser v United States,* 315 US 60, 80; 62 S Ct 457; 86 L Ed 680 (1942); *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979). A similarly deferential standard

of appellate review has traditionally been applied to jury verdicts in civil cases. See *Kupkowski v Avis Ford, Inc,* 395 Mich 155, 167-168; 235 NW2d 324 (1975); *Dodd v Secretary of State,* 390 Mich 606, 612; 213 NW2d 109 (1973).

My colleague would analogize the issue of falsity to the "constitutional fact" issue of "actual malice" in a defamation case, over which appellate courts are constitutionally required to exercise independent review. See, e.g., *Harte-Hanks Communications, Inc v Connaughton,* 491 US 657; 109 S Ct 2678; 105 L Ed 2d 562 (1989); *Bose Corp v Consumers Union of United States, Inc,* 466 US 485; 104 S Ct 1949; 80 L Ed 2d 502 (1984). Another classic example of a constitutional fact question subject to independent appellate review is the voluntariness of a confession. See, e.g., *Arizona v Fulminante,* 499 US —; 111 S Ct 1246; 113 L Ed 2d 302 (1991). Actual malice and the voluntariness of a confession, however, are mixed questions of fact and law. Falsity, by contrast, would appear to be a classic issue of pure historical fact. Indeed, with regard to subsidiary factual questions underlying the ultimate issue of actual malice, the Court in *Harte-Hanks* strongly suggested—and four concurring justices made explicitly clear—that the appellate court need *not* independently review "the historical facts—e.g., who did what to whom and when . . . ." 491 US 694 (White, J., joined by Rehnquist, C.J., concurring); see also *id.* at 688 (opinion of the Court); *id.* at 697-699 (Scalia, J., concurring in the judgment); *id.* at 696 (Kennedy, J., concurring) (indicating agreement with Justice Scalia's analysis).[2]

---

[2] Even while reaffirming independent appellate review in the *actual malice* context, the Court in *Harte-Hanks* noted that underlying factual questions like "credibility determinations" are *not* independently reviewed. See *id.* at 688. Justice BRICKLEY himself suggests

Not only does it seem clear that the United States Supreme Court is not inclined to find an independent review standard constitutionally required with regard to the issue of falsity, but this Court's own precedents have consistently viewed the determination of truth or falsity in defamation cases as a purely factual question which should generally be left to the jury. See *Steadman v Lapensohn,* 408 Mich 50, 53-54; 288 NW2d 580 (1980); *Cochrane v Wittbold,* 359 Mich 402, 408; 102 NW2d 459 (1960).[3]

*Hepps,* of course, has left unsettled the question whether falsity may be proved merely by a preponderance of the evidence, or whether some higher burden (such as "clear and convincing evidence") is constitutionally required.[4] For reasons elaborated below, however, I believe this case can properly be resolved without any further inquiry into the precise scope of either appellate review of falsity or the constitutional burden of proving falsity at trial. I would simply conclude that there is no proper need or basis in this case to adopt the standard of independent appellate review urged by my colleague.

---

that his independent review standard would not extend to "credibility determinations." *Ante,* p 112, n 17. Yet the factual issue of falsity will frequently amount to no more and no less than a credibility contest between witnesses at trial. Thus, if Justice BRICKLEY's independent review standard with regard to falsity is to have any real meaning, it would necessarily have to apply even to credibility issues, a province traditionally reserved most jealously for the jury as trier of fact.

[3] This is not to suggest, in light of free speech concerns, that a jury's finding with regard to falsity should be immune from any effective appellate scrutiny. For reasons elaborated below, I do not think we need to address in this case whether, for example, appellate review of falsity should be limited to the extremely lenient "sufficiency of the evidence" standard traditionally used to review civil jury verdicts, or whether a more searching standard (such as "clearly erroneous" review) should be employed.

[4] See *Hepps* at 779, n 4 ("[w]e . . . have no occasion to consider the quantity of proof of falsity that a private-figure plaintiff must present").

## II. DEFAMATION ON THE BASIS OF IMPLICATIONS
## FROM TRUE FACTS

I find it useful to begin by noting the issues which the parties do *not* raise on this appeal. Most significantly, plaintiffs have conceded the truth— or at least that they are unable to prove the material falsity—of all the *specific factual statements* contained in the four disputed articles. Plaintiffs' claim, in a nutshell, is that the articles, taken as a whole, nevertheless conveyed to the average reader certain vague, overall "implications" which plaintiffs claim to be false. These alleged implications, as defined by plaintiffs themselves, boil down to the proposition that plaintiffs "are Mafia."[5] Defendants, for their part, do not challenge the jury verdict on the ground that plaintiffs failed to prove the requisite degree of fault, nor do they challenge the finding that plaintiffs are private rather than public figures. Defendants' defense is essentially one of truth. Defendants both deny that the implications of which plaintiffs complain can fairly be said to arise from the articles, and contend in any event that, given the conceded truth of the specific factual statements, any overall implications which do arguably arise therefrom are necessarily privileged as "implications from true facts."

[5] As Justice BRICKLEY notes, plaintiffs, toward the very beginning of this litigation, responded to defendants' interrogatories by stating that

> the defamation allegations . . . are not necessarily based on a false statement(s) in any one particular article, but rather, that the entire series of articles, in their entirety, injured the reputations of plaintiffs as the same represented a false portrayal, implication, imputation and/or insinuation that plaintiffs, among other things, are or were members and/or associates of an organized criminal society, otherwise known as the "Mafia" . . . .

Plaintiffs' claim is thus vastly different from the more typical or familiar "defamatory implication" claim. Plaintiffs do not allege that any particular factual statement by defendants is reasonably susceptible of conveying a specific factual implication which is provably false. Nor do they contend that defendants, by selectively omitting crucial relevant facts, have conveyed any misleading factual implication on the basis of otherwise true statements. Rather, they contend that a collection of concededly true factual statements amounts to false defamation because of the inferential or speculative conclusions that the average reader might draw from the totality of those statements. Thus, while it is undoubtedly true, as a general matter, that defamatory implications may be potentially actionable if provably false, the case law cited by plaintiffs reiterating that familiar principle is ultimately inapposite and unhelpful.

I believe the issue in this case, properly framed, is best analyzed by recourse to those cases which have addressed the somewhat elusive problem of "defamation by implications from true facts." While this difficult area of defamation law has not yet been fully explored—and I have no pretensions that this Court can or should presume to offer any definitive solutions today—a number of cases have set forth useful and persuasive analyses of the issue. Perhaps the leading case is *Strada v Connecticut Newspapers, Inc,* 193 Conn 313, 323; 477 A2d 1005 (1984), where "the plaintiff [sought] to recover from a publication where all the underlying and stated facts [were] proved to be true, or substantially true, claiming that the 'slant' of the article [gave] rise to allegedly false and defamatory implications." In a thoughtful and carefully analyzed opinion, the Connecticut Supreme Court concluded that "[t]he goal of nurturing a free and

active press in the political arena mandates denial of recovery by a public figure where the allegation of defamation 'depends fundamentally on an interpretation of various aspects of the broadcast, not on anything directly said in it.' " *Id.*

> When any inference or innuendo does not arise from the omission of material facts, but rather from the editorial choice of layout, the plaintiff may not recover for libel by innuendo. The media would be unduly burdened if, in addition to reporting facts about public officers and public affairs correctly, it had to be vigilant for any possibly defamatory implication arising from the report of those true facts. [*Id.* at 326.]

It is true that *Strada* involved the alleged defamation of a public figure, and the court suggested at some point that its rule should be limited to that category of cases. I believe, however, that the gist of *Strada's* reasoning, if not necessarily its precise contours, properly applies to this case, which, although involving private-figure plaintiffs, involves speech of public concern.[6]

I find highly instructive the reasoning of *Woods v Evansville Press Co, Inc,* 791 F2d 480 (CA 7, 1986). The court in *Woods,* while conceding that implied defamatory statements may be actionable, and even assuming for purposes of analysis that the article there at issue could reasonably be read to contain the "defamatory implications" ascribed to it by the plaintiff in that case, see *id.* at 486, held that

> requiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw

---

[6] The issue of possible organized-crime involvement in a major business and entertainment development is certainly of public concern.

from a publication would undermine the uninhibited, open discussion of matters of public concern. A publisher reporting on matters of general or public interest cannot be charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory innuendoes that could be drawn from the article. [*Id.* at 487-488.]

The court in *Strada* cited a case also discussed by my Brother BRICKLEY, *Memphis Publishing Co v Nichols,* 569 SW2d 412 (Tenn, 1978), which addressed a claim of defamation by implication from true facts. See *ante,* pp 124-126. I agree with my colleague that *Nichols* does not support plaintiffs' claim in this case. Indeed, I think the differences between the claims in *Nichols* and this case are very illustrative. The plaintiff in *Nichols* was a gunshot victim who alleged that she was falsely defamed by an article describing the shooting, which occurred at the victim's home. The female assailant's husband was present in the victim's home at the time of the shooting, and he was also fired upon. The defendant newspaper published those facts, which were true as far as they went, but failed to report that the victim's own husband, as well as two other neighbors, were also present at the time, and that the group was simply conversing in the living room. By omitting those crucial relevant facts, the article, while technically true, directly and misleadingly implied that the victim and the assailant's husband were caught in an illicit, adulterous relationship. See *id.* at 414, 419. As the court held:

The proper question is whether the *meaning* reasonably conveyed by the published words is defamatory . . . . The publication of the complete facts could not conceivably have led the reader to

conclude that [the plaintiff] and [the assailant's
husband] had an adulterous relationship. The pub-
lished statement, therefore, so distorted the truth
as to make the entire article false and defamatory.
[*Id.* at 420. Emphasis in original.]

In this case, by contrast, there is no claim that
defendants, by omitting crucial relevant facts, con-
veyed any skewed or misleading implications. The
implications of which plaintiffs complain are sim-
ply the ordinary and natural implications that
might be expected to flow from the specific factual
statements   published   by   defendants,   whether
taken separately or together. While many of those
statements were undoubtedly defamatory, in that
they had a tendency to injure the reputations of
plaintiffs, they were also concededly true. While
the "overall implications" allegedly conveyed by
the articles as a whole may also have been defam-
atory, their thrust was not misleading or different
in kind from that of the concededly true specific
statements. Rather, the implications, if any, sim-
ply reflected the accumulated thrust of the conced-
edly true stated facts. It logically follows that such
implications—even if not themselves capable of
being either verified or disproven—would necessar-
ily be protected by the same defense of truth
shielding the specific factual statements. This is
simply not a case, like *Nichols,* where the separate
factual ingredients of the publication add up to
more than the sum of their parts, to the extent
that a collection of true facts, by the omission of
crucial associated facts, ends up conveying an
actionably false implication. True facts, whatever
their "implications," cannot become actionable
simply because they are collected and published
together in a straightforward manner.[7]

_____

[7] I agree with my Brother BRICKLEY that the one potentially

It is significant that plaintiffs, while conceding the truth of all the specific, concrete factual statements in the disputed articles, define the allegedly false "implications" in exceedingly broad and vague terms. Plaintiffs have been unable to define those implications any more specifically than in terms of the vague and perhaps undefinable proposition that they "are Mafia." Yet, while they strenuously assert the general falsity of that proposition, they have not disputed the essential truth of all of defendants' concrete assertions regarding their specific activities and financial ties to commonly-reputed organized-crime figures.[8] Plaintiffs have conceded that they appear on the lists of organized-crime suspects maintained by the Federal Bureau of Investigation. Indeed, plaintiff Locricchio conceded, in an interview before the disputed articles were even published, that rumors of plaintiffs' ties to organized crime and investigations of them by numerous law enforcement agencies had already become so persistent that he feared his own mother might suspect him.

None of this, of course, necessarily establishes

---

troublesome aspect of the disputed articles is the caption of the photograph in the second article regarding the discovery of Harvey Leach's body in the trunk of his car. See *ante,* pp 131-132. The caption itself fails to note the important facts that the body was discovered in 1974, five years before the articles were published, and that plaintiffs were never implicated in the murder. I also agree, however, that this isolated defect, for which defendant reporter Michael Wendland indicated regret at trial, is not enough to support plaintiffs' claim. The caption, taken by itself, does not refer to either plaintiff, and conveys little comprehensible information at all without the background and context provided by the text of the second article. That text accurately, and with reasonable completeness, describes the known facts associated with Leach's murder, including the fact that intensive investigations by numerous law enforcement agencies never found any connection between plaintiffs and Leach's murder.

[8] As the circuit court noted in granting defendants' motion for directed verdict, it is essentially undisputed that "[p]laintiffs were personal friends of, or had done business with, innumerable individuals whose names are commonly associated with organized crime . . . ."

that plaintiffs "are Mafia"—however that elusive concept may be defined. I would not presume to speculate, and this Court need not decide, whether plaintiffs "are Mafia." It is noteworthy that defendant reporter Michael Wendland stated at trial his belief—which he believed to be consistent with the content and thrust of the disputed articles—that plaintiffs themselves were *not* directly involved in organized crime, although he believed that organized-crime figures were indirectly involved in financing the Pine Knob development. It is to be hoped, of course, that the average, fair-minded reader would stick to the concededly true facts as presented in the disputed articles, and avoid leaping to speculative or unwarranted conclusions about plaintiffs. But it simply acknowledges human nature to observe that there is no way to guarantee or control what any reader may infer, speculate, or conclude on the basis of facts of which he is made aware.

For purposes of this case, it is enough to conclude, as a matter of law, that a defamation defendant cannot be held liable for the reader's possible inferences, speculations, or conclusions, where the defendant has not made or directly implied any provably false factual assertion, and has not, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication. In sum, the overall implications that may flow from true factual statements straightforwardly presented are ordinarily as privileged for defamation purposes as the statements themselves. Any other conclusion, in my view, would unacceptably inhibit the free reporting of news and information of public concern.[9]

---

[9] My Brother Levin would permit recovery against defendants for publishing concededly true facts, simply because those facts inevitably convey unflattering overall implications about plaintiffs. He does not

### III. CONCLUSION

This Court's concern for the freedom to report opinions and truthful information about people is longstanding. In the very first volume of our Reports, we noted that "[i]n this country, and particularly in this western country, great latitude has been allowed to individuals in speaking and writing 'of and concerning' private and public characters . . . ." *People v Jerome,* 1 Mich 142, 144 (1848). In line with this historic concern, and for the reasons detailed above, I agree that the judgment of the Court of Appeals must be reversed, and that the directed verdict in favor of defendants must be reinstated.

LEVIN, J. (*dissenting*). The signers of the lead opinion conclude that Joseph Judeas Locricchio and Gary Francell[1] failed to prove that the Pine Knob series published in the Detroit News falsely implied that they "were members or associates of organized crime."[2] The concurrence concludes that the Detroit News is not subject to liability because it "has not made or directly implied any provably false factual assertion, and has not, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication."[3]

I dissent because there was sufficient evidence for submission to the jury that the Detroit News

---

explain how his analysis takes account of the unique and troublesome issues raised in the area of implications from true facts.

I agree with my colleague, of course, that the mere rephrasing of a statement into the form of a question, whether "Is it Mafia?" or "Is he a womanizer?" cannot immunize the statement. But my colleague overlooks the plethora of concededly true facts in the disputed articles which rendered the provocative headline question a reasonable comment on those facts.

[1] The verdict awarded Francell damages and found that Locricchio had no cause for action.

[2] *Ante,* p 89.

[3] CAVANAGH, C.J., *ante,* p 144.

falsely implied that Locricchio and Francell were members or associates of organized crime.

Michael Wendland, one of the reporters, testified at the trial that he recalled telling Locricchio and Francell, when he interviewed them shortly before the Pine Knob series was run, that "we did not find any organized crime involvement in the ownership of Pine Knob, *nor did we think that your clients were members of the Mafia."* (Emphasis added.) He added, "I don't believe Gary Francell or Joe Locricchio are members of the Mafia." The follow-up question and answer were:

> *Q.* You knew that when this headline was written, didn't you?
> *A.* Yes, I—that was my conclusion.

Nevertheless, the Detroit News published the Pine Knob series which posed the question whether Locricchio's and Francell's investment in Pine Knob was Mafia—"[i]s it Mafia?"—and which linked them to two unsolved murders.

Wendland and another reporter who worked on the story, Jean Gadomski, acknowledged that although they had investigated the Harvey Leach and Agnes Brush murders, as far as they could determine, neither Locricchio nor Francell was a suspect. Nevertheless, the Detroit News Pine Knob series linked them to the investigation of those homicides in an article which repeated the question, "Is it Mafia?"

The question in the instant case is whether the jury could reasonably conclude that the Pine Knob series implied that Locricchio and Francell were members or associates of organized crime, and that it was defamatory and false. I would answer the question in the affirmative.

I

The four articles appeared on the front pages of the Detroit News during the four-day period beginning Sunday, April 22, 1979.

The first article began with the headline, "The Pine Knob story: How 2 friends and hustle created a big resort, millions in debts and a question: 'Is it Mafia?'" Each of the four articles included a caption box, reading:

> In the last eight years Pine Knob, in Oakland County, has developed from a losing ski resort into one of the nation's foremost entertainment complexes, worth millions. During these years the persistent question in Michigan and elsewhere has been, "Is it Mafia?"

The first article states that

> tangled in the confusing, often incredible story of how [Locricchio and Francell] made Pine Knob, are:
>
> Two unsolved murders. Though separate, the killings share common elements that lead to some of the same people who figured in Pine Knob's devopment.
>
> A so-called "money wash" in which a Toronto firm linked to an associate of Meyer Lansky, the Mafia's key money man, hid the source of a $200,000 Pine Knob loan.
>
> A $4-million cost overrun by Locricchio and Francell in the building of a glittering theater for Las Vegas's Aladdin Hotel and Casino.
>
> Several investors associated with organized crime who either lent or helped Locricchio and Francell raise large sums of money.

The tag line at the end of the first article read:

> Tomorrow: A money wash and two murders.

The second article, headlined, "The Pine Knob story: How loan got 'washed,'" featured a photograph of an automobile with its trunk open. The caption under the photograph read, "Harvey Leach's car was found with his body in the trunk." This article was continued on a later page, which led with the headline, "How vital Pine Knob loan was 'washed' in Toronto," and was accompanied by a picture of Leach. The story traced the $200,000 loan, and described the "laundering" process. The article also contained the following statement:

> While the transaction was legal, it was unorthodox and it attracted the attention of the Ontario Provincial Police, who in turn talked to the FBI.

And with regard to the murders,

> Locricchio and Francell say they know nothing about either killing, and insist it is coincidental that some of the same people were involved in the loans to Leach and Pine Knob. A score of police agencies have investigated the murders and have not proved otherwise. . . . The only suspect [in the murder of Agnes Brush] was the 61-year-old laborer who worked with Miss Brush.

The third article was headlined "The Pine Knob story: A brush with bankruptcy."

The fourth and last article was headlined, "Partners stalked by Mafia-hunters," and, on the continuing page, "Mafia-hunters stalk Locricchio, Francell."

II

Chief Justice Rehnquist opened his review of the law in one of the most recent pronouncements of the United States Supreme Court, *Milkovich v*

*Lorain Journal Co,* 497 US 1; 110 S Ct 2695; 111 L
Ed 2d 1, 13 (1990), with the following:

> Who steals my purse steals trash;
> 'Tis something, nothing;
> 'Twas mine, 'tis his, and has been slave to thousands
> But he that filches from me my good name
> Robs me of that which not enriches him
> And makes me poor indeed. [*Othello,* act III, scene 3.]

In *Milkovich,* the Court stated that the majority
was not persuaded that in addition to the protec-
tions of media expression the Court had enunci-
ated, beginning with *New York Times Co v Sulli-
van,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686
(1964):

> an additional separate constitutional privilege for
> "opinion" is required to ensure the freedom of
> expression guaranteed by the First Amendment.
> [111 L Ed 2d 19.]

The Court turned to the case at hand and said:

> The dispositive question in the present case then
> becomes whether or not a reasonable factfinder
> could conclude that the statements in the Diadiun
> column *imply* an assertion that petitioner Milko-
> vich perjured himself in a judicial proceeding. We
> think this question must be answered in the affir-
> mative. [*Id.* Emphasis added.]

The "dispositive" question, as stated by the
United States Supreme Court in *Milkovich,*
whether a reasonable factfinder could conclude
that the statements implied an assertion that was
defamatory, is long established, and is expressed in
the Restatement of Torts as follows:

> The meaning of a communication is that which

the recipient correctly, or mistakenly but reasonably, understands that it was intended to express. [3 Restatement Torts, 2d, § 563, p 162.]

The Restatement continues that "[t]he court determines . . . whether a communication is capable of bearing a particular meaning, and . . . whether that meaning is defamatory. . . . The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient." *Id.,* § 614, p 311.

In *Gustin v Evening Press Co,* 172 Mich 311, 313; 137 NW 674 (1912), this Court affirmed an order of the circuit court overruling a demurrer to plaintiff's declaration for libel. The article was headlined:

Goes to Australia.
Alpena Man Turns Over Assets and Seeks New Country.

The Court said that " 'the sting of the libel was contained in the headlines,' " and quoted with approval Justice COOLEY's statement in his work on torts that in determining whether words are libelous, " 'they are to be taken in their plain and natural import, according to the ideas they are calculated to convey to those to whom they are addressed . . . .' " *Id.,* p 315.[4]

In *McNair v Hearst Corp,* 494 F2d 1309, 1310 (CA 9, 1974), the Seattle Post-Intelligencer had published the following headline and first two paragraphs:

"The High Cost of a Divorce

Five years ago, Barbara Evans hired a lawyer to represent her in a divorce action.

---

[4] 1 Cooley, Torts, pp 409-410.

Today the lawyer owns the home, worth between $55,000 and $65,000, which Mrs. Evans received as part of the 1966 divorce settlement . . . ."

The court held that a reasonable reader could interpret these words to mean that Mrs. Evans had paid her attorney the value of her house for her divorce, *although the body of the article related the true circumstances* that the lawyer was paid $3000 for the divorce, and obtained the house when the estranged husband failed to make the payments:

Under Washington law whether an article is true will depend on what it is read to say—on how it would ordinarily be understood by persons reading it. [Citation omitted.] The question here, as we view it, is whether the article as a whole can be said effectively to have eliminated the impact of any false impression created at the outset. In our judgment this question cannot here be answered as matter of law and remains a question for the jury. [*Id.*, p 1311.]

In *Las Vegas Sun, Inc v Franklin,* 74 Nev 282, 286; 329 P2d 867 (1958), the Supreme Court of Nevada considered a series of articles. The court said that the libelous statements were

found, not in the body of the article, but in its headline and tag-line. The headline read,
"Babies for sale. Franklin black market trade of child told."

The tag-line read,
"Tomorrow—Blackmail by Franklin."

The body of the article factually recited the manner in which Franklin had secured the relinquishment of a baby for adoption.

The court considered the newspaper's argument "that the headline and tagline cannot be considered apart from the context in which they were used. Thus, they contend, the headline must be qualified by and read in the light of the article to which it referred and the tagline must be qualified by and read in the light of the subsequent article to which it referred." *Id.* at 287. The court rejected the argument, stating:

> The text of a newspaper article is not ordinarily the context of its headline, since the public frequently reads only the headline. [Citations omitted.] The same is true of a tagline or leader, since the public frequently reads only the leader without reading the subsequent article to which it refers. The defamation of Franklin contained in the headline was complete upon its face. It was not necessary to read the article in order that the defamatory nature of the statement be understood or connected with Franklin. The same is true of the tagline. [*Id.*]

Nor is it determinative here that the sting of the headline concludes with a question mark—"Is it Mafia?":

> A man cannot libel another, by the publication of language, the meaning and damaging effect of which is clear to all men, and where the identity of the person meant cannot be doubted, and then escape liability through the use of a question mark. [*Spencer v Minnick,* 41 Okla 613, 617; 139 P 130 (1914).]

A defamatory statement, "He is a womanizer," or "She is a tramp," would not become less so if phrased, "Is he a womanizer?" or "Is she a tramp?"

III

This is not a case where a plaintiff seeks to hold a media defendant "liable for the *reader's* possible inferences, speculations, or conclusions"[5] drawn from a "straightforward" presentation of the facts. The headlines and tag lines, and the persistently posed question, "Is it Mafia?" suggested the inferences, speculations, and conclusions for the reader.

The jury could properly find that a reasonable reader of the Detroit News could understand that the Pine Knob Series not only conveyed the fourteen facts the trial court found to be true, but also that Locricchio and Francell were guilty of a continuing course of criminal wrongdoing generally associated with organized crime and membership or association in the "Mafia," including involvements in the murders of Agnes Brush and Harvey Leach, and an illegal money laundering scheme, and that the communication was defamatory and false.

MALLETT, J., took no part in the decision of this case.

---

[5] CAVANAGH, C.J., *ante*, p 144 (emphasis added).