*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

AG,

Petitioner-Appellee,

UNPUBLISHED
June 13, 2024

v

No. 365201
Macomb Circuit Court
LC No. 22-004806-PH

OEJ,

Respondent-Appellant.

Before: GARRETT, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Respondent, OEJ, appeals as of right the trial court's order denying respondent's motion to terminate or modify a personal protection order (PPO). The PPO precluded respondent from approaching, contacting, or making online posts about petitioner, AG, a police officer. The PPO also precluded respondent from coming within a quarter mile of the Warren Police Department and Warren City Hall.

On appeal, respondent argues that the trial court abused its discretion by issuing the PPO without a statutory basis and in violation of his First Amendment rights. We conclude that there was a statutory basis for the PPO to issue and that respondent engaged in conduct that was not constitutionally-protected speech. However, we conclude that the scope of the PPO substantially burdened respondent's constitutionally-protected speech. Accordingly, we affirm the trial court's order denying respondent's motion to terminate the PPO, but we reverse with respect to the geographic scope of the PPO and remand for further amendment of the PPO.

## I. FACTUAL BACKGROUND

Respondent operates a public YouTube channel, "Uncovering America," on which he posts videos documenting his encounters—which he calls "constitutional audits"—with law enforcement agencies with the stated purpose of improving the quality of policing in the metro-Detroit area. On January 5, 2020, respondent was arrested by members of the Warren Police Department, including petitioner, for disturbing the peace. During that encounter, respondent filmed at a private, residential home without permission and shouted "derogatory comments" at the residents and officers. The Macomb County Prosecutor charged respondent with disturbing

the peace in the 37th District Court, Docket No. 2020-W200217-OM. Respondent was released on a $2,000 bond. While respondent's district court case was pending, the 37th District Court issued a no-contact order, prohibiting respondent from going within a quarter mile of petitioner. Respondent began uploading videos on his YouTube channel and Facebook page related to the case. Respondent uploaded approximately 97 videos related to his arrest. Some of the videos accused petitioner of wrongfully arresting him.

On October 1, 2020, respondent approached petitioner outside of the Warren Police Department. Respondent approached petitioner from behind, while petitioner was walking toward his car at the end of his workday. Before identifying petitioner, respondent inquired whether he "check[ed] out" or took "a look at" his videos. Petitioner advised respondent that his conduct violated the no-contact order and directed him to leave. Petitioner believed that respondent went behind some nearby bushes; however, a video of the encounter showed that respondent continued to walk along the sidewalk. After the interaction, respondent was filmed stating: "I'm gonna tear his ass up once this case is over."

On October 9, 2020, the 37th District Court held a bond violation hearing finding that respondent violated his bond by approaching petitioner outside of his place of employment and raised his bond to $50,000. The criminal charges against respondent were eventually dismissed because of the unavailability of witnesses. Respondent continued to post videos about petitioner after his case was dismissed.

On December 20, 2022, respondent uploaded a video onto his YouTube channel, entitled "Dear [petitioner's] Family_ Thank you for raising a HERO!!" The video showed a photograph of petitioner's extended family, including his wife, children, parents, siblings, nephews, and nieces. The photograph was followed by a video of respondent's arrest. The video concluded with text calling petitioner a "terrorist." Respondent secured petitioner's family picture from the public Facebook page of petitioner's mother.

On December 21, 2022, respondent uploaded a post onto his YouTube Community tab, which stated: "If filing a complaint with your department doesn't strike gold I'll file a complaint with your family! My demands must be met before I lose my patience regarding case W200217!" The post then showed a photograph depicting a Black man with a noose around his neck, surrounded by six white men. On the same day, respondent made several more YouTube Community posts. The first post stated: "I will share any and all information available on the individuals at fault to expose them for who they really are & for what they've done!" The post then showed a photograph of petitioner and his wife, holding their two young daughters. The next post demanded petitioner be fired. Respondent also uploaded a video, entitled "Cops mom just got FB [Facebook] poked!¡!," followed by three emojis, which depicted respondent saying in slow motion: "It's yours truly, none other, then the man who poked your mother, [petitioner]" followed by laughing and a clip of respondent's arrest. Respondent also responded to a comment on one of his YouTube videos, stating: "They robbed my family of $5200 & arrested me 3 times unlawfully– taking me away from my family. FTP." "FTP" is an acronym, which means "f*ck the police." At some point, respondent sent a Facebook friend request to petitioner's wife, which she declined.

Petitioner filed a petition for a PPO on December 21, 2022, alleged these posts caused him to suffer emotional distress and fear for his and his family's safety. In response to the social media posts, petitioner continued to monitor respondent's YouTube channel. He testified that he and his wife were "upset" and "fearful." Petitioner claimed he lost sleep. He also notified his children's school of the potential threat and an officer was stationed outside the school. His fear increased in response to threats toward his family. Respondent removed the photographs of petitioner's family from his social media profiles in response to petitioner's PPO request.

The trial court entered a PPO under MCL 600.2950a(1), prohibiting respondent from conduct proscribed by MCL 750.411h or MCL 750.411i, including following or appearing in petitioner's sight, appearing at petitioner's workplace, approaching petitioner in public, and contacting petitioner directly or through a third party. Additionally, the PPO prohibited respondent from posting messages on the Internet in violation of MCL 750.411s.

Respondent moved to modify or terminate the PPO, arguing that his conduct was legal and protected by the First Amendment, US Const, Am I. The trial court denied respondent's motion finding reasonable and sufficient justification existed for the continuation of the PPO, and respondent's speech constituted true threats. The trial court, however, modified the PPO to also exclude respondent from going within a quarter mile of the Warren Police station and Warren City Hall. This appeal followed.

## II. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's determination whether to issue a PPO. *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id*. Factual finding underlying a PPO are reviewed for clear error. *Id*. We review constitutional issues de novo. *TT v KL*, 334 Mich App 413, 438; 965 NW2d 101 (2020).

"The petitioner bears the burden of establishing reasonable cause for issuance of a PPO, and of establishing a justification for the continuance of a PPO at a hearing on the respondent's motion to terminate the PPO." *Hayford*, 279 Mich App at 326. The trial court must make its ruling after considering the totality of the circumstances. See *PF v JF*, 336 Mich App 118, 130; 969 NW2d 805 (2021).

## III. STATUTORY BASIS FOR A PPO

Respondent argues that the trial court erred by continuing the PPO because there was not reasonable cause to issue the PPO. We disagree.

The trial court issued a PPO under MCL 600.2950a(1), which allows a trial court to "enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under section 411h, 411i, or 411s of the Michigan penal code." MCL 600.2950a(1). The trial court entered the PPO under each of the cited statutes. "MCL 750.411h concerns stalking and MCL 750.411i pertains to aggravated stalking." *TT*, 334 Mich App at 440.

"Stalking" is "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated,

threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411h(1)(e); MCL 750.411i(1)(e). A "course of conduct" is defined as "a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose." MCL 750.411h(1)(a); MCL 750.411i(1)(a). "Harassment" is "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." MCL 750.411h(1)(d); MCL 750.411i(1)(d). However, "[h]arassment does not include constitutionally protected activity or conduct that serves a legitimate purpose." MCL 750.411h(1)(d); MCL 750.411i(1)(d).

MCL 750.411s prohibits "cyberstalking by proxy or cyberharassing by proxy." *Buchanan v Crisler*, 323 Mich App 163, 179; 922 NW2d 886 (2018) (quotation marks and citation omitted). Under MCL 750.411s(1):

> A person shall not post a message through the use of any medium of communication, including the internet or a computer, computer program, computer system, or computer network, or other electronic medium of communication, without the victim's consent, if all of the following apply:

> (a) The person knows or has reason to know that posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim.

> (b) Posting the message is intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested.

> (c) Conduct arising from posting the message would cause a reasonable person to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

> (d) Conduct arising from posting the message causes the victim to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested. [MCL 750.411s(1).]

## A. UNCONSENTED CONTACTS

Respondent first argues that the trial court erred by issuing a PPO under MCL 750.411h and MCL 750.411i because respondent did not make repeated unconsented contacts. We disagree.

"Unconsented contact," as contemplated in the definition of "harassment" is "any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued." MCL 750.411h(1)(f); MCL 750.411i(1)(f). Both statutes provide a nonexhaustive list of examples of unconsented contact, which, in relevant part, includes: "(*i*) Following or appearing within the sight of that individual; (*ii*) Approaching or confronting that individual in a public place or on private property; [and] (*iii*) Appearing at that individual's workplace or residence." MCL 750.411h(1)(f)(*i*)-(*iii*); MCL 750.411i(1)(f)(*i*)-(*iii*). "There must be evidence of two or more acts

of unconsented contact that caused the victim to suffer emotional distress and that would cause a reasonable person to suffer emotional distress." *Hayford*, 279 Mich App at 330.

In this case, respondent made one in-person unconsented contact with petitioner on October 1, 2020, when respondent approached petitioner as he left work. See MCL 750.411h(1)(f)(*iii*); MCL 750.411i(1)(f)(*iii*). The remainder of respondent's contacts were made online. "Unconsented contacts" as contemplated by the nonexhaustive lists in MCL 750.411h and MCL 750.411i include electronic communications. See MCL 750.411h(1)(f)(*vi*); MCL 750.411i(1)(f)(*vi*) ("Sending mail or electronic communications to that individual."). "This Court and others have found that [Facebook tags], posts, and similar means of electronic communication (e.g., e-mail and text) are 'contacts' between the sender and recipient." *ARM v KJL*, 342 Mich App 283, 296; 995 NW2d 361 (2022).

Respondent made multiple social media posts directed at petitioner and his family which amounted to unconsented contacts. In one such post, a YouTube video posted on December 20, 2022, respondent criticized petitioner for arresting him. The post included a photograph of petitioner's family. The video was captioned "Dear [petitioner's] Family_ Thank you for raising a HERO!!" By specifically addressing the video to petitioner's family, respondent directed the video to petitioner. Respondent clearly indicated his intent for petitioner and his family to watch the video.

The same day, respondent made a YouTube post, showing an image of a man with a noose around his neck with the caption: "If filing a complaint with your department doesn't strike gold I'll file a complaint with your family! My demands must be met before I lose my patience regarding case W200217!" By using the phrase "your family," respondent specifically directed the post to petitioner and his family. Respondent also posted a picture of petitioner with his wife and daughters, captioned: "I will share any and all information available on the individuals at fault to expose them for who they really are & for what they've done!" Respondent did not outright "tag"[1] petitioner in these posts; however, he more directly contacted petitioner's family in two instances. First, respondent made a video titled: "Cops mom just got FB poked!¡!" followed by three emojis, which depicts respondent, in slow motion, saying: "It's yours truly, none other, then the man who poked your mother, [petitioner]" followed by laughing and a clip of respondent's arrest.[2] Second, respondent sent a friend request to petitioner's wife.

Viewed under the totality of the circumstances, see *PF*, 336 Mich App at 130, these posts amount to unconsented contacts under MCL 750.411h(1)(f) and MCL 750.411i(1)(f). The language and context of the posts indicate they were directed at petitioner and his family. Based on the volume and content of the posts, it is clear respondent intended for petitioner to view them. Likewise, respondent more directly notified petitioner of the posts. He sought petitioner's

---

[1] "Tagging" a person in a Facebook post or YouTube comment ensures that the individual is notified of the content.

[2] A Facebook "poke" is a feature that allows a user to send a notification to another user. Facebook, *Help Center* <https://www.facebook.com/help/messenger-app/219967728031249> (accessed May 31, 2024).

attention by sending a Facebook friend request to petitioner's wife and "poking" petitioner's mother on Facebook, individuals closely associated with petitioner. Further, on October 1, 2020, respondent approached petitioner as he left work, and asked: "You check out the video?" By asking if petitioner had seen respondent's video, respondent indicated he intended for petitioner to view his social media content. Given the full context of respondent's conduct, the fact that the public posts addressed petitioner and his family without directly tagging them does not remove them from the realm of unconsented contacts.

Further, evidence in the record supported that petitioner suffered emotional distress as a consequence of these contacts and that a reasonable individual would suffer emotional distress in response to the contacts. MCL 750.411h(1)(d); MCL 750.411i(1)(d). In response to the social media posts, petitioner feared that respondent would harm him or a member of his family. He notified his children's school of the potential threat and an officer was stationed outside of the school. The trial court did not err by finding respondent engaged in a "course of conduct" directed toward petitioner such that there was a statutory basis under MCL 750.411h and MCL 750.411i to issue a PPO.

## B. CONDUCT ARISING FROM ONLINE POSTS

Because a statutory basis to issue the PPO in relation to respondent's electronic communications existed under MCL 750.411h and MCL 750.411i, we need not address whether a statutory basis existed to issue the PPO under MCL 750.411s. See MCL 600.2950a(1) (providing that a PPO may issue to restrain an individual from engaging in conduct prohibited under § § 411h, 411i, or 411s). Regardless, we agree with respondent that a statutory basis did not exist to enter a PPO under MCL 750.411s because no evidence in the record supports that respondent's posts caused others to contact and harass petitioner.

"MCL 750.411s does not prohibit an actor from posting any and all messages of every kind." *Buchanan*, 323 Mich App at 175. To issue a PPO under MCL 750.411s, "a petitioner must establish that the respondent engaged in conduct that involved posting a message on the Internet or a computer without the petitioner's consent and that the four elements found in Subdivisions (a) through (d) of MCL 750.411s(1) are all satisfied." *TT*, 334 Mich App at 441. "Notably, the focus of these elements is on the conduct the actor intended to cause by posting the message and the effect of that conduct." *Buchanan*, 323 Mich App at 179. As this Court previously explained,

> [MCL 750.411s] envisions a scenario in which a stalker posts a message about the victim, without the victim's consent, and as a result of the posting, others initiate unconsented contacts with the victim. These unconsented contacts, arising from the stalker's postings, result in the harassment of the victim. In this manner, by posting a message that leads to unconsented contact, the stalker is able to use other persons to harass the victim. [*Id*. at 180.]

Plainly, respondent's posts were placed on the Internet without petitioner's consent. MCL 750.411s(1). However, respondent's conduct only meets the first two of the four required elements in MCL 750.411s(1)(a)-(d). On December 21, 2023, respondent made several YouTube posts showing pictures of petitioner and his family. In a post with a picture of petitioner, his wife, and young daughters, respondent stated: "I will share any and all information available on the

individuals at fault to expose them for who they really are & for what they've done!" This post was an invite for members of the public to request personal information regarding the individuals depicted in the photograph. By threatening to "expose" petitioner by sharing personal information about him, respondent indicated his intent to encourage others to harass petitioner and his family. See MCL 750.411s(1)(b). Respondent had reason to know that inviting others to receive petitioner and his family's personal information could cause additional unconsented contacts. See MCL 750.411s(1)(a). Despite respondent's conduct meeting the first two elements, no evidence in the record supports that anyone contacted petitioner as a result of the posts. See MCL 750.411s(1)(c)-(d). In fact, petitioner did not allege that anyone contacted him as a result of the posts. Consequently, there was no "conduct arising from posting the messages" such that respondent's actions violated MCL 750.441s. Therefore, the trial court erred by finding statutory grounds under MCL 750.411s to issue a PPO.

### C. CONSTITUTIONALLY-PROTECTED SPEECH

Respondent argues the trial court erred by issuing and continuing the PPO because the speech that formed the basis for the PPO was constitutionally protected. We disagree.

"A person has the right to freedom of speech under both the federal and state Constitutions." *ARM*, 342 Mich App at 297; see also US Const, Am 1; Const 1963, art 1, § 5. "Speech over the Internet is protected to the same extent as speech over other media . . ." *Buchanan*, 323 Mich App at 181 (quotation marks and citation omitted; ellipses in original). However, "a person's right to free speech must be understood in light of another person's interest in being left alone." *ARM*, 342 Mich App at 299. With this in mind, the nondomestic PPO statutory scheme specifically exempts from its reach the protected speech of those covered by an order. See, e.g., MCL 750.411h(1)(d) (excluding "constitutionally protected activity" from the definition of harassment).

The right to speak freely is not unlimited. There is no First Amendment protection for true threats. *Buchanan*, 323 Mich App at 189 n 5. True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *TM v MZ*, 326 Mich App 227, 239; 926 NW2d 900 (2018). The trial court erred by determining respondent's speech was not constitutionally protected because the posts were true threats. In this case, respondent's social media posts do not include threats of unlawful violence against petitioner. The language in respondent's posts is ambiguous, and does not clearly indicate an intention to commit violence. Although the trial court erred in its analysis, it reached the correct result. This Court will not reverse a decision of the trial court when the trial court reached the correct outcome for the wrong reason. *People v King*, 297 Mich App 465, 475; 824 NW2d 258 (2012).

The First Amendment also permits restrictions upon the content of speech for speech integral to criminal conduct. *Buchanan*, 323 Mich App at 185. Several courts have relied on this exception in rejecting First Amendment challenges to cyberstalking statutes. *Id*. "[C]ourts analyzing First Amendment challenges relating to online postings and harassment often use a case-specific approach to determine whether the speech-integral-to-criminal-conduct exception may be applied." *Id*. at 188. "[T]his analysis often hinges on whether the victim is a public or private figure and whether the topic is one of public concern." *Id*. The relevant inquiry is "whether the

postings are intended solely to cause conduct that will harass a private victim in connection with a private matter or whether the publication of the information relates to a public figure and an important public concern. *Id*. at 188-189. "[W]hen it is asserted that the postings involve a matter of public concern, the court must consider the content, form, and context of the online postings to determine whether they involve constitutionally protected speech on a matter of public concern." *Id*. at 191.

The First Amendment "accord[s] maximum protection to public speech about public figures." *Locricchio v Evening News Ass'n*, 438 Mich 84, 118; 476 NW2d 112 (1991). A "limited-purpose public figure" is one "who voluntarily injects himself into a specific public controversy and who is a public figure with respect to limited issues . . . ." *Buchanan*, 323 Mich App at 189 (quotation marks and citation omitted). A "general-purpose public figure" is one "who attains such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id*. (quotation marks and citation omitted).

In this case, petitioner concedes he is a limited-purpose public figure to the extent he is employed as a police officer. However, petitioner argues respondent's social media posts, which were the basis of the PPO, were not directed toward petitioner as a public figure, but instead as a private individual. We agree that several of respondent's posts were aimed at petitioner as a private individual.

Respondent's YouTube channel, in large part, addresses matters of public concern. The purpose behind respondent's channel is stated to be to audit police departments and report on whether police officers engage in unconstitutional conduct. Respondent's YouTube channel documents his interactions with police, and criticizes police departments and officers whom respondent believes engage in unjust policing. To the extent respondent made videos condemning petitioner for arresting him, respondent's speech is constitutionally protected because it involves a public figure and a matter of public concern. Respondent's post calling for petitioner to be fired, and respondent's post proclaiming "FTP," both relate to matters of public concern and petitioner's position as a limited-purpose public figure.

However, respondent's posts harassing and threatening petitioner's family fall outside the scope of matters of public concern. On December 21, 2022, respondent made a YouTube post, stating: "If filing a complaint with your department doesn't strike gold I'll file a complaint with your family! My demands must be met before I lose my patience regarding case W200217!" The post was accompanied by an image of a man being hanged. Although this post includes a picture, which invokes racial imagery, and makes a statement on a public issue, this post extends beyond matters of public concern by specifically threatening petitioner's family. In context, this post was accompanied by another post, that showed a picture of petitioner's wife and daughters, and stated: "I will share any and all information available on the individuals at fault to expose them for who they really are & for what they've done!" This post provides no commentary on policing or the fairness of respondent's arrest, and instead only threatens to reveal information about petitioner and his family.

Respondent also made a video entitled, "Cops mom just got FB poked!¡!" In that video, respondent stated in slow motion: "It's yours truly, none other, then the man who poked your mother, [petitioner]," followed by laughing and a clip of respondent's arrest. The video does not

comment on the arrest. Instead, the video is respondent's publication of an unwelcome contact with a member of petitioner's family.

Posts threatening and harassing petitioner's family are not "constitutionally protected speech on a matter of public concern." *Id*. at 191. Respondent's speech about petitioner's family falls under the speech-integral-to-criminal-conduct exception to the First Amendment. The trial court did not err in finding there was reasonable cause to issue and continue the PPO. To the extent the PPO was issued in response to constitutionally-protected speech related to issues of public concern and petitioner's role as a public figure, the trial court erred. However, the PPO was properly issued in response to harassing speech directed at petitioner's family.

## IV. SCOPE OF THE PPO

Respondent argues that the amended PPO burdened substantially more speech than necessary by prohibiting respondent from coming within a quarter mile of the Warren Police Department and Warren City Hall. We agree.

"[C]ontent-neutral time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Truckor v Erie Twp*, 283 Mich App 154, 163; 771 NW2d 1 (2009). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v Rock Against Racism*, 491 US 781, 791; 109 S Ct 2746; 105 L Ed 2d 661 (1989).

> For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests. Such a regulation, unlike a content-based restriction of speech, need not be the least restrictive or least intrusive means of serving the government's interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. [*McCullen v Coakley*, 573 US 464, 486; 134 S Ct 2518; 189 L Ed 2d 502 (2014) (quotation marks and citation omitted).]

In this case, the amended PPO prohibited respondent from coming within a quarter mile radius of Warren City Hall and the Warren Police Department. Respondent argues that the geographic prohibition was not narrowly tailored to serve a substantial governmental interest. We agree.

A prohibition from coming within a quarter mile radius of Warren City Hall and the Warren Police station is a content-neutral restriction. See *Ward*, 491 US at 791. Nothing in the geographic prohibition specifically restricts the content of respondent's speech. The restriction also serves a significant governmental purpose because the PPO was issued to prevent respondent from stalking petitioner. The relevant question before us is whether the restriction substantially burdens "more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 US at 486.

Respondent operates a YouTube channel, which he states has the goal of documenting respondent's interactions with police departments, and providing commentary on the constitutionality of his interactions with police. While, as previously discussed, videos made by respondent harassing petitioner's family are not matters of public concern, and are not constitutionally-protected speech, the majority of respondent's social media content is constitutionally-protected speech. Respondent posted many videos documenting his interactions with police. By restricting respondent's access to the Warren Police Department and City Hall, the trial court substantially burdened respondent's ability to engage in this constitutionally-protected speech.

The trial court restricted respondent from going within a quarter mile of the Warren City Hall and the Warren Police Department to prevent respondent from interacting with petitioner in his workplace. However, the same outcome could have been achieved through a PPO prohibiting respondent from coming within a quarter mile of petitioner. By prohibiting respondent from going within a quarter mile of the Warren City Hall and the Warren Police Department, the trial court greatly restricted respondent's ability to interact and film his encounters with police. A substantial portion of this burden does not further the goal of protecting petitioner from the harassment of his family. See *id*. The trial court erred by amending the PPO to restrict respondent from going within a quarter mile of the Warren City Hall and the Warren Police Department.

## V. CONCLUSION

The trial court did not err by issuing the PPO because petitioner demonstrated there was reasonable cause to believe respondent engaged in conduct prohibited under MCL 750.411h and MCL 750.411i. Although posts criticizing petitioner in his work as a police officer are constitutionally-protected matters of public concern, speech harassing and threatening petitioner's family is not constitutionally-protected speech. Consequently, we affirm the trial court's denial of respondent's motion to terminate the PPO insofar as the PPO prohibits him from approaching petitioner and communicating with him online. However, the trial court did err by amending the PPO to restrict respondent from coming within a quarter mile of Warren City Hall and the Warren Police Department because this restriction substantially burdened respondent's constitutionally-protected speech. We affirm in part, reverse in part, and remand. We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Deborah A. Servitto
/s/ James Robert Redford

-10-